**Kerry M. GOUGH, Trustee in Bankruptcy of Louis Rosen, d/b/a Walnut Creek Furniture, Plaintiffs-Appellees,**

v.

**ROSSMOOR CORPORATION, and Crestmark Carpet and Drapery Company, Defendants-Appellants.**

No. 77–2047.

United States Court of Appeals, Ninth Circuit.

Aug. 9, 1978.

Rehearing and Rehearing En Banc Denied Oct. 27, 1978.

James E. Harrington (argued), of Pettit, Evers & Martin, San Francisco, Cal., for defendants-appellants.

Maxell Keith (argued), San Francisco, Cal., for plaintiffs-appellees.

Before MERRILL, KILKENNY and CHOY, Circuit Judges.

MERRILL, Circuit Judge:

The question on appeal is whether, absent a definition of the relevant market, the record supports a judgment that appellants violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. We hold that it did not and reverse judgment of the district court.

### THE CAST

Rossmoor Leisure World (Leisure World) is a co-operative housing development for retired adults, located in Walnut Creek, California.

Rossmoor Corporation (Rossmoor) is the builder and developer of Leisure World.

Leisure World Foundation (the Foundation) is a nonprofit corporation established to perform administrative services for the residents of Leisure World and also to perform organizational, promotional and sales functions for Rossmoor. In order to meet the requirements for securing FHA financing for construction of the housing, the Foundation is formally independent of Rossmoor.[1] (Title to the community recreational facilities is held in trust by another independent foundation that appears less frequently in the case: the Golden Rain Foundation.)

Crestmark Carpet and Drapery Company (Crestmark) is a wholly owned subsidiary of Rossmoor, formed for the purpose of selling carpets and draperies to the Leisure World residents. The Foundation has leased space in its administration building to Crestmark giving it the exclusive right to sell carpets and draperies from a site within Leisure World.

The Leisure World News (the News) is a community newspaper owned and published by the Foundation. It is primarily concerned with Leisure World events and is used as a promotional device for prospective purchasers of housing.

Louis Rosen was the owner of a furniture and carpet store in Walnut Creek; appellee Gough is his trustee in bankruptcy.

## THE GRIEVANCE

In April, 1965, the Foundation began publishing the Leisure World News. Rosen was solicited by the advertising manager and placed seven carpet, drapery and furniture advertisements in various issues of the News. In July, 1965, under a new policy, the News refused to accept further advertisements from carpet retailers other than Crestmark, and no further advertisements from Rosen were accepted.

Rosen then commenced this action, alleging violations of § 1 and § 2 of the Sherman Act, 15 U.S.C. § 1 and § 2. He alleged that Rossmoor, the Foundation, Golden Rain Foundation and Crestmark had conspired to restrain competition by refusing to allow him to advertise in the News, and that the conspiracy was with the intent of enabling Crestmark to monopolize the market for carpets in Leisure World. He sought treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, for injuries suffered by him by reason of the Sherman Act violations.

## THE CASE

The case has been before this court on two prior occasions.

The Foundation and Golden Rain Foundation were dismissed from the case prior to trial, although their status as coconspirators was retained. Following trial to a jury the issues were submitted to the jury in the form of interrogatories, which were answered by the jury as follows:

"1. Did the defendants and Leisure World Foundation or Golden Rain Foundation by means of a common plan, scheme or design have the power and intention to exclude plaintiff from the

1. The relationships between the Foundation and Rossmoor on the one hand, and the Foundation and the residents on the other, involve a complex arrangement, making possible the development of the community, the financing of construction and the sale of Leisure World residences. Leisure World, as it presently exists, did not come into existence at one time. It resulted from a series of development projects, each adding geographically to the community. For each project a mutual corporation was organized which took from Rossmoor title to the land involved. Those who planned to secure a residence in the project purchased shares in the mutual, which shares entitled them to occupancy of a residence upon its construction.

Rossmoor and the mutual then entered into a purchase and construction contract, and when 90 percent of the mutual stock was sold construction commenced. The Foundation acts as an administrative arm of the mutuals. At the outset of a new project it is also involved in promotion and sale of stock in the mutual and thus is closely aligned in interest with Rossmoor, whose interest lies in the construction and sale of residences. With construction completed the principal function of the Foundation has to do with its responsibilities to the residents and mutual stockholders—the handling of their residential concerns, the upkeep of common areas, and management of community facilities.

carpet and/or other business in Rossmoor Leisure World?

Yes.

2. Did defendants enter into a common plan, scheme or design with Leisure World Foundation or Golden Rain Foundation to prevent plaintiff from advertising carpets in the Leisure World News such as to act as a restraint on plaintiff's business of selling carpets or other merchandise at Rossmoor Leisure World?

Yes.

3. If your answer to either of the preceding questions is in the affirmative, did such restraint have a substantial effect on interstate commerce or the flow of interstate commerce?

No.

4. Has plaintiff suffered any monetary damage by reason of its inability to advertise in Leisure World News?

Yes.

5. If so, please indicate the amount opposite the appropriate type of damage you find to have been suffered.

| Net Profits | $18,143.00 |
| Good Will . | 22,738.00" |

Because of the jury answer to interrogatory No. 3, relating to interstate commerce, the trial court entered judgment for the defendants on the ground that the court lacked jurisdiction under the Sherman Act. The first appeal to this court was then taken. During the pendency of that appeal Rosen was adjudicated bankrupt and appellee Gough, as trustee in bankruptcy, was substituted as plaintiff-appellant. On Gough's appeal this court held that a substantial effect on interstate commerce appeared as matter of law and that it had been error to put the jurisdictional question to the jury. *Gough v. Rossmoor Corp.*, 487 F.2d 373, 377 (9th Cir. 1973). This court originally directed that the case be remanded with instructions that judgment be entered for the plaintiff in accordance with the jury's findings. Appellants sought

rehearing and asked this court to enter judgment notwithstanding the verdict on the ground that the record did not support the jury's findings and that the findings did not support judgment in that no finding had been made defining the relevant market, and that there was nothing in the record upon which such a finding could have been made. This court declined to rule upon appellants' motion for judgment but amended its original opinion and remanded the case to the trial court for further proceedings consistent with the opinion. 487 F.2d at 378. On remand Rossmoor renewed its motions for judgment n. o. v. and new trial.

The trial court ruled that it was foreclosed by this court's opinion from entertaining the post trial motions and the second appeal to this court was taken, this time by the defendants. We held that the trial court was not foreclosed from entertaining the motions on their merits and remanded with instructions that appellants' motions be entertained. *Gough v. Rossmoor Corp.*, 533 F.2d 453 (9th Cir. 1975), *cert. denied*, 429 U.S. 857, 97 S.Ct. 155, 50 L.Ed.2d 134 (1976).

On the second remand the trial court denied the motions, ruling that the evidence was sufficient to permit the jury to find that there was a common plan between Rossmoor, Crestmark and the Foundation, under which the Foundation would cause the News to refuse to allow Rosen to advertise his carpets in the News, which plan was intended to lessen competition. Judgment was entered for Rosen in treble the damages found by the jury, with interest, costs and counsel fees. This appeal followed.

## THE ISSUES

Appellants assign error in a number of respects,[2] with only two of which we shall concern ourselves. We find merit in appellants' contentions that appellee has failed to show violation either of § 1 or § 2 of the Sherman Act through failure to present

---

**2.** In addition to the issues discussed appellants contend (1) that as integral parts of a single enterprise they are legally incapable of conspiracy; (2) that appellee has failed to prove conspiracy between Rossmoor and the Foundation; (3) that the evidence does not support the finding or amount of damages; (4) that hearsay evidence was improperly admitted.

evidence defining the relevant market and establishing that competition was unreasonably restrained in that market and that monopolization of the market was attempted.

Before reaching the merits of these issues we must dispose of two preliminary contentions of appellee.

Appellee first contends that these issues were not raised before the district court and, that by the interrogatories to the jury, appellants conceded that Leisure World is the relevant market. We disagree.

■ Unless the alleged anticompetitive conduct is *per se* unreasonable, the fact that the conduct restrained trade in a relevant market is an essential part of a plaintiff's case (as we shall discuss later), and the burden of establishing it lies on him: *Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d 620, 627 (9th Cir. 1977); *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 803 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 56 L.Ed.2d 1094 (1977); *Cataphote Corp. v. DeSoto Chem. Coatings, Inc.*, 450 F.2d 769, 773 (9th Cir. 1971), *cert. denied*, 408 U.S. 929, 92 S.Ct. 2497, 33 L.Ed.2d 341 (1972). Lack of market definition is not a matter of affirmative defense that must be specifically pleaded.

Rosen, in his complaint, alleged that the market within which defendants' "monopolistic position" could be assessed was Leisure World; this allegation was denied. Rosen, in his pretrial brief, made reference to the evidence by which he proposed to establish that Leisure World was the relevant market. Following trial, in his argument to the jury, counsel for Rosen stated that the contested issue of relevant market pertained to Rosen's claims under both § 1 and § 2. An instruction submitted by Rosen and objected to by appellants was given to the jury, reading in part:

"The test here is whether the combination affects a definable marketing or trade area, and whether it unnaturally diverts the transportation of goods to or from that area."

As to the interrogatories, the jury was not asked to define the relevant market. The interrogatories assumed that Leisure World was the relevant market. When, as in this case, the jury verdict is in response to written questions upon the factual issues, the effect of a failure to present an issue to the jury is set forth in Rule 49(a), Federal Rules of Civil Procedure. That rule provides in part:

"If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

Thus, here a court finding to the effect that Leisure World was the relevant market was essential if the jury's findings were to have any legal effect. Under the rule a finding to that effect is presumed and the question thus is whether there is evidence to support such a finding. In moving for judgment notwithstanding the verdict, both before this court and before the district court, appellants stressed the lack of evidence from which the relevant market could be defined.

■ We conclude that the question of relevant market definition was in the case from the outset and that failure to question the jury respecting the matter did not amount to a concession that Leisure World was the relevant market.

■ Appellees' second contention is that any question respecting relevant market has been resolved by law of the case; that our remands on the prior appeals indicated that the only question remaining was whether the evidence supported the verdict of the jury. Since, under Rule 49(a), the jury findings do not stand alone, we read the remands as calling for a decision on whether the evidence supported all applicable findings—those of the court as well as those of the jury. On the second remand,

the district court considered the merits of appellants' post-trial motions for the first time and the appeal from the denial of those motions is now properly before this court.

We turn, then, to the merits of the issues before us: whether, through failure to define the relevant market, appellee has failed to establish either a restraint of trade under § 1 or an attempt to monopolize under § 2 of the Sherman Act.

### A. Unreasonable Restraint of Trade

■ We turn first to § 1. This section does not concern itself with all injuries suffered by a competitor through unfair or overzealous competition. Such injuries are generally matters for state law. Section 1 of the Sherman Act is concerned with *restraints* on competition, and the competition with which the Act is concerned is more than that contributed by the plaintiff. To amount to an unreasonable restraint of trade the anticompetitive conduct must have an effect greater than its effect upon the plaintiff's business. *See, e. g., Mutual Fund Investors v. Putnam Management Co., supra,* 553 F.2d at 627. As it has often been stated, "the antitrust laws * * * were enacted for 'the protection of *competition,* not *competitors* * * *.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697 (1977). The conduct must have an adverse impact on the competitive conditions in general as they exist within the field of commerce in which the plaintiff is engaged. In *Knutson v. Daily Review, Inc., supra,* 548 F.2d at 803, this court stated:

"A termination is not unlawful because of some adverse effect on the distributor's business, even if the effect is the elimination of the distributor from the

market. The complaining distributor must show that the refusal to deal was intended to or did bring about some restraint of trade beyond the loss of business suffered by the distributor or the market's loss of a distributor-competitor."

■ Certain classes of restraints have been held to be *per se* unreasonable. As stated in *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958):

"'* * * there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable * * *.'"

Only four categories of restraints have been held to be *per se* unreasonable: horizontal and vertical price fixing;[3] horizontal market division;[4] group boycotts or concerted refusals to deal;[5] and tie-in sales.[6] Our first question is whether the restraint here fits any of these categories. It does not fit easily. The only prospect would appear to be the group boycott or concerted refusal to deal. There was indeed a refusal by the Foundation (through the News) to deal with Rosen in the sense that it refused to allow Rosen to advertise in the News.

---

**3.** *See, e. g., United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

**4.** *See e. g., United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

**5.** *See, e. g., Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

**6.** *See, e. g., Northern Pac. Ry. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

There is some evidence to support the jury's finding that a concert of action on the part of Rossmoor and Crestmark existed, which concert perpetrated the refusal to deal by the Foundation and for the purposes of this discussion we will assume that such an agreement existed.

Such concert of action may suffice to create a conspiracy but it cannot suffice to constitute such a concerted refusal to deal as has so far been held to be *per se* unreasonable. In all cases so far holding such restraints to be *per se* unreasonable, there has been some horizontal concert of action taken against the victims of the restraint. In *Mutual Fund Investors v. Putnam Management Co., supra*, this court rejected the contention that the refusal to deal there under fire constituted a *per se* illegal group boycott, stating "At issue is an alleged conspiracy among vertically integrated organizations and agreements among them are not *per se* illegal." 553 F.2d at 626.[7]

The Second Circuit has recently noted in its *en banc* decision in *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (1978):

"It is important to distinguish between 'horizontal' restraints, i. e. agreements between competitors at the same level of market structure, and 'vertical' restraints, i. e. combinations of persons at different levels of the market structure such as manufacturers and distributors. See *United States v. Topco, Associates*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Horizontal restraints alone have been characterized as 'naked restraints of trade with no purpose except stifling competition.' *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); and, therefore, *per se* violations of the Sherman Act."

579 F.2d at 131. *See also Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir. 1978).

In Sullivan, *Antitrust*, at 259 (1977), the author states: "If the *per se* rule respecting boycotts is to become coherent, we must recognize that it applies only where competitors engage together to inhibit others with whom they compete by depriving those others of elements needed in the competitive context." Here the concert of action was by a sole competitor and that competitor's parent company, and was in no way an agreement between competitors. The agreement, which only prevented advertising of carpets in the News, did not deprive Rosen of an element necessary to compete; other means of advertising, including other newspapers, were readily available.

We conclude that the restraint in our case does not fall within any of the four categories of *per se* violation so far recognized.

Appellee protests, however, that the restraint amounts to a denial of access to the Leisure World market;[8] that it is clearly anticompetitive in purpose with no competi-

---

**7.** *See Ackerman-Chillingworth v. Pacific Electrical Contractors Ass'n*, 579 F.2d 484, 490 n. 7 (9th Cir. Mar. 22, 1978) (discussing characteristics of boycotts considered illegal *per se*). Although the court in *Ackerman-Chillingworth* seems to classify *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), as a *per se* illegal group boycott by vertically integrated conspirators, it should be noted that the conspiracy did involve horizontal concert of action at the manufacturers' level and that it was the manufacturers who actually boycotted the plaintiff by refusing to sell their products to it.

The Second Circuit appears recently to have concluded that as a result of the decision in *Continental T.V. v. GTE Sylvania, infra* n. 9, no vertical restrictions save price fixing are *per se* illegal. *National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953 (2d Cir. 1978).

*Accord, H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 245 (5th Cir. 1978). The court in *National Auto* affirmed a directed verdict for the defendants finding that the plaintiff had failed to meet its burden of showing that the challenged "fleet allotment" system, which assured each dealer of a minimum number of cars for resale, violated the rule of reason—that it was "unreasonable in view of 'the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.' *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918)." 572 F.2d at 960.

**8.** As we note later, access to Leisure World was not denied. Access to the advertising columns of the News was denied, but that was all.

tive benefits claimed for it, and that this should be enough to constitute it *per se* unreasonable.

The caution exercised by the Supreme Court when a new category is sought to be added to those already recognized as *per se* unreasonable was demonstrated in *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). There the Court considered whether vertical market division should be added. It refused to add it to the *per se* list, stating:

> "Horizontal territorial limitations, like '[g]roup boycotts, or concerted refusals by traders to deal with other traders' (*Klor's v. Broadway-Hale Stores, supra*, [359 U.S. at] 212 [79 S.Ct. 705, 3 L.Ed.2d 741]), are naked restraints of trade with no purpose except stifling of competition. A vertical territorial limitation may or may not have that purpose or effect. * * * We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a 'pernicious effect on competition and lack . . . any redeeming virtue' (*Northern Pac. R. Co. v. United States, supra*, p. 5, [78 S.Ct. 514, 2 L.Ed.2d 545]) and therefore should be classified as *per se* violations of the Sherman Act."

372 U.S. at 263, 83 S.Ct. at 702.[9]

Thus, *White Motors*, and *Continental T.V. v. GTE Sylvania, supra* note 9, warn us that additions to the limited *per se* list are not to be made on an *ad hoc* basis. At least they are not to be made without evidence supporting a determination that the restraint is such as to have a pernicious effect on competition. We cannot say, as matter of law, that such would be the effect here. We do not even know the extent to which the restraint contributed to Rosen's business

failure. There was no attempt to put him out of business or to prevent Leisure World residents from doing business with him (such as could have been achieved by a tie-in with the sale of mutual shares). The restraint was limited to depriving him of the right to communicate with the Leisure World residents through the advertising columns of the News. As we have noted, other newspapers and means of conveying his commercial message were still open to him, and accordingly he was not without suppliers of that which was denied to him by the refusal to deal. We cannot, without evidentiary support, credit any implied finding that deprivation of advertising in this one community newspaper had such a pernicious effect on competition within the relevant market (whatever that may be) as to warrant holding that restraint *per se* unreasonable.

We conclude that the conduct here in question cannot be said to be *per se* an unreasonable restraint of trade and a violation of § 1.

If the agreement or practice is not one of those conclusively presumed to be unreasonable, it must be proved to be unreasonable, and this, as noted in *Northern Pacific Railway Co., supra*, takes considerable proving. It is done by resort to what has come to be called the rule of reason.

From the time of its announcement in *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 51 L.Ed. 619 (1911), and the elaboration of the rule by Mr. Justice Brandeis in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918), to its latest articulation in *Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), *supra* note 9, the rule of reason has been primarily directed to a balancing of the

9. In *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Court arrived at the opposite result, holding that vertical market division was *per se* unreasonable. However, this decision was reexamined in *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), and *Schwinn* was overruled. The Court stated:

> "When competitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the Act."

433 U.S. at 59, 97 S.Ct. at 2563. We discuss the rule of reason later in this opinion.

competitive evils of the restraint against the competitive benefits asserted on its behalf.

However, the fact that no competitive benefits are advanced in favor of a restraint (as would seem to be the case here) does not automatically constitute it unreasonable under the Sherman Act. As we have already noted, it must first be established to be a restraint on competition and this involves a consideration of the impact of the restraint on the competitive conditions within the field of commerce in which the plaintiff was engaged and upon those commercially engaged in competition within it. As one writer has put it:

"It is the process of competition with which the Act is concerned, and a practice will not fall under its ban unless it displays an adverse impact on that process which is more than trivial."

Sullivan, *Antitrust,* at page 178.

Before this study can even be commenced, however, we must know with what field of competition we are concerned and the dimensions of that field. Market definition is essential. As the Supreme Court stated, in *Continental T.V. v. GTE Sylvania, supra*: "An antitrust policy divorced from market considerations would lack any objective benchmarks," 433 U.S. at 53 n. 21, 97 S.Ct. at 256. Thus in determining the relevant market the courts are not free to accept whatever market is suggested by the plaintiff as fitting most persuasively with his contention that his power to compete effectively has suffered injury. *See, e. g., Knutson v. Daily Review, Inc., supra,* 548 F.2d at 803–04.

There is nothing in the record from which a finding can be based as to what the relevant market is in this case. The interrogatories given to the jury assume that the sale of carpets to the customers residing in Leisure World is the relevant market and we have necessarily implied a finding by the court to this effect. On its face this

finding strikes us as a dubious one. We know that Crestmark is the only commercial establishment located in the Leisure World complex. The commercial district of Walnut Creek, in which Rosen was located, has not been defined. The relevant geographic market is determined, in part, by the area to which the purchaser can reasonably turn to obtain the product. *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449, 457–58 (9th Cir. 1966), *rev'd on other grounds,* 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967); *see* Sullivan, *Antitrust,* at 68. Here we do not know the extent to which this or other commercial districts within reach were patronized by the Leisure World residents or the ratio their patronage bears to that of other Walnut Creek customers.

We conclude that appellee cannot prevail under the rule of reason for failure to prove relevant market and an injury to competition within that market. For failure of proof in this respect appellants were entitled to judgment notwithstanding the verdict on appellee's claim under § 1.

### B. *Attempt to Monopolize*

Turning to § 2 of the Act we are confronted by appellee's allegation that the perpetration by Rossmoor and Crestmark of the Foundation's denial of advertising space was pursuant to an attempt on the part of Rossmoor and Crestmark to monopolize the Leisure World market in carpets.[10] Appellee points out that under *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), when an attempt to monopolize is charged it is not necessary to establish market power on the part of the would-be monopolist as is required when the claim is that monopolization has actually been achieved, and accordingly that

"When the charge is attempt (or conspiracy) to monopolize rather than monopoli-

10. The jury was instructed concerning both § 1 and § 2 of the Sherman Act and we assume herein that the jury's answer to special inter-

rogatory No. 1 constitutes a finding in favor of appellee on the attempt to monopolize claim.

zation, the relevant market is 'not in issue.' "

327 F.2d at 474.

Since *Lessig*, the extent of proof required to establish an attempt to monopolize has been before this court on many occasions.[11] The most recent pronouncement of the prima facie requirements is provided by *Janich Bros., Inc. v. American Distilling Co., supra* n. 11. This court held there that a plaintiff must prove three elements: (1) specific intent to control prices or destroy competition with respect to a part of commerce, (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose, and (3) a dangerous probability of success. 570 F.2d at 853. *See also Marquis v. Chrysler Corp., supra* n. 11. We pointed out, however, that this circuit has allowed a "short-cut method" of establishing liability, in that proof of probability of success can be supplied by inference drawn from proof of specific intent and that proof of specific intent can in turn be supplied by inference drawn from proof of predatory or anticompetitive conduct which constitutes an unreasonable restraint of trade. *Janich, supra*, 570 F.2d at 854. To the same effect is *Knutson, supra*, 548 F.2d at 814; *Greyhound Computer, supra* n. 11, 559 F.2d at 504 n. 37.

The question thus is whether an inference of intent to monopolize the trade in carpets with residents of Leisure World can be drawn from the action taken here: causing the Foundation to bar Rosen from advertising in the News. This was not predatory. There is no indication that Crestmark intended to put Rosen out of business. This being so, no inference of intent to monopolize can be drawn from the anticompetitive conduct in question unless it amounted to an unreasonable restraint of trade under § 1. While conduct which would, in the case of a conspiracy, amount to a *per se* violation of § 1 would constitute an unreasonable restraint of trade without proof of market or market power, under the rule of reason market definition is required to establish a § 1 violation, as we have previously noted. Thus, in the absence of proof of relevant market and market power, the plaintiff must prove either predatory conduct or a *per se* violation of § 1 to prove an attempt to monopolize.[12] Without these limitations the door to a § 2 attempt would be open far wider than necessary to meet the concerns expressed by this court in *Greyhound Computer,* [13] *supra,* and could permit treble damage recovery where no remote possibility of monopolization would appear to exist and where the impact on competition of the conduct in question is limited to its impact on the plaintiff.

---

11. *Cornwell Quality Tools Co. v. C.T.S. Co.,* 446 F.2d 825, 832 (9th Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972); *Bushie v. Stenocord Corp.,* 460 F.2d 116, 121 (9th Cir. 1972); *Moore v. Jas. H. Matthews & Co.,* 473 F.2d 328, 332 (9th Cir. 1973); *Hallmark Industry v. Reynolds Metals Co.,* 489 F.2d 8, 11–13 (9th Cir. 1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); *Knutson v. Daily Review, Inc., supra,* 548 F.2d at 813–15; *Greyhound Computer Corp., Inc. v. International Business Machines Corp.,* 559 F.2d 488, 504 (9th Cir. 1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 56 L.Ed.2d 790 (1978); *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848 (9th Cir. 1977); *Marquis v. Chrysler Corp.,* 577 F.2d 624 (9th Cir. 1978).

12. *Janich* puts it even more strongly:

"Where a plaintiff relies only upon a defendant's conduct to establish an attempted monopolization claim and does not show market power, specific intent to monopolize should ordinarily be inferred only where the alleged conduct is of a kind clearly threatening to competition or clearly exclusionary."
570 F.2d at 854 n. 4.

13. The court in *Greyhound Computer* was concerned that:

"A single firm that did not control something close to 50 percent of the entire market, see *Twin City Sportservice, Inc. v. Charles O. Finley & Co., supra,* 512 F.2d at 1274, would be free to indulge in any activity however unreasonable, predatory, destructive of competition and without legitimate business justification. Any concern not dangerously close to monopoly power could deliberately destroy its competitors with impunity."
559 F.2d at 504.

"More specifically, there is support in the decisions and legislative history for the conclusion that § 2 was intended to prohibit unreasonable restraints of trade that exclude competition even when they are imposed by a single trader."
559 F.2d at 504 n. 37.

We conclude that no inference of intent to monopolize can be drawn from the anticompetitive conduct here in question, and that appellants were entitled to judgment notwithstanding the verdict on appellee's claim under § 2.

Judgment reversed.

CHOY, Circuit Judge, concurring:

I concur in the majority opinion. However, I must make one observation about the extent of proof necessary to establish an attempt to monopolize claim. I agree with my Brothers that three elements are necessary for a prima facie claim: (1) specific intent to control prices or destroy competition with respect to a part of commerce, (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose, and (3) a dangerous probability of success. We have so held in *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 853 (9th Cir. 1977), and *Marquis v. Chrysler Corp.*, 577 F.2d 624, 641 (9th Cir. 1978).[1]

But in *Greyhound Computer Corp. v. International Business Machines*, 559 F.2d 488, 504 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 56 L.Ed.2d 790 (1978), we held that only two elements were necessary. We stated that "[a] prima facie case of attempt to monopolize is made out by evidence of a specific intent to monopolize 'any part' of commerce [element (1)], plus anticompetitive conduct directed to the accomplishment of that unlawful purpose [element (2)]." *Id.*

However, by holding that Crestmark's actions were neither predatory nor anticompetitive, we need not inquire into what additional element or elements would be necessary for a successful claim.

---

1. I also agree that this Circuit recognizes a "short-cut method" of establishing liability by inferences drawn from proof of predatory or anticompetitive conduct which constitutes an unreasonable restraint of trade. *See Janich Bros.*, 570 F.2d at 854.