ADIDAS AMERICA, INC., Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

No. Civ.A. 98–2510–GTV.

United States District Court,
D. Kansas.

Aug. 26, 1999.

---

Lori R. Schultz, W. Dennis Cross, Morrison & Hecker L.L.P., Kansas City, MO, A. Bradley Bodamer, Morrison & Hecker L.L.P., Overland Park, KS, David T. Alexander, Jesse W. Markham, Jr., Tracy M. Preston, Orrick, Herrington & Sutcliffe, San Francisco, CA, Bruce Keplinger, Timothy S. Davidson, Norris & Keplinger, L.L.C., Overland Park, KS, Eric S. Walters, Jackson, Tufts, Cole & Black, L.L.P., San Jose, CA, Susheela Jayapal, David M. Howitt, adidas America, Inc., Beaverton, OR, for Adidas America Inc., plaintiff.

Heather Suzanne Woodson, Stinson, Mag & Fizzell, P.C., Leawood, KS, Michael J. Davis, David E. Everson, Jr., Thomas P. Schult, Stinson, Mag & Fizzell, P.C., Kansas City, MO, Gregory L. Curtner, Miller, Canfield, Paddock & Stone, P.C., Ann Arbor, MI, for National Collegiate Athletic Association, defendant.

### MEMORANDUM AND ORDER

VANBEBBER, Chief Judge.

Adidas America, Inc. ("Adidas")[1] filed this action for damages and injunctive relief against defendant National Collegiate Athletic Association ("the NCAA") alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and state law claims of tortious interference with contractual relations, tortious interference with prospective economic advantage, breach of contract, and violations of public policy and NCAA bylaws and rules. The case is before the court on the NCAA's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). For the reasons set forth in this memorandum and order, the NCAA's 12(c) motion (Doc. 87) is granted.

### I. FACTUAL BACKGROUND

When considering a motion to dismiss, the court assumes the truth of all well-pleaded factual allegations and makes all possible reasonable inferences in favor of the plaintiff. Thus, for purposes of the NCAA's motion to dismiss, the court takes the following allegations of facts from Adidas' Complaint.

The NCAA is a voluntary, unincorporated association of approximately 1,100 four-

---

1. In their pleadings, the parties refer to plaintiff as "adidas" with a lower case "a" to reflect plaintiff's trademarked name. The court, however, will refer to plaintiff as "Adidas" with a more grammatically correct capital "A."

year colleges and universities, conferences, affiliated associations and other educational institutions. Adidas is a Delaware Corporation with its principal place of business in Beaverton, Oregon. Adidas is one of the United States' leading suppliers of athletic footwear, apparel, and accessories.

Adidas currently contracts with NCAA member institutions and their coaches to advertise and promote its products. Pursuant to these contracts, known as sponsorship agreements, Adidas provides cash, free or discounted athletic shoes and apparel, and other goods and services to a particular school's teams, coaches, or entire athletic program. In exchange, Adidas obtains various promotional rights, the most significant of which is the team's or coach's agreement to wear Adidas' trademarked apparel and footwear bearing Adidas' advertising logos in intercollegiate competition, practice, and other athletic activities. These sponsorship agreements and, therefore, the promotional rights offered by NCAA member institutions are important components of Adidas' marketing strategy and that of its competitors. The association of a sporting apparel manufacturer's brand with particular teams, athletes, or coaches "authenticates" the brand as a high quality brand that serves the high performance needs of college athletics. According to Adidas, the NCAA and its member institutions have agreed to illegally restrict the sales of the abovemention promotional rights through its enforcement of Bylaw 12.5.5, which limits the amount of advertising that may appear on a student-athlete's uniform and equipment used during intercollegiate competition.[2]

According to Adidas, the NCAA and its member institutions, acting as a cartel, are using Bylaw 12.5.5 to illegally restrict the sale of NCAA promotional rights. This intentional restriction of promotional rights artificially limits the price and quality options available to apparel manufacturers as consumers of promotional space, forces manufacturers to pay additional amounts for billboard space or other advertising, decreases the selection of apparel offered to the end consumer, increases the price of the apparel for end consumers, and financially benefits the NCAA and its member institutions. The complaint further alleges that the NCAA benefits from its enforcement of Bylaw 12.5.5 as follows. The NCAA competes directly with Adidas and other manufacturers for promotional space on NCAA member institutions' uniforms. This competition is the result of the NCAA's commercialization of its own "NCAA" logo. The NCAA, in partnership with the Collegiate Licencing Company, is actively licencing use of the NCAA logo to apparel manufacturers at exorbitant royalty rates. Furthermore, the NCAA has asked that all member institutions place the NCAA logo on their student-athlete's uniforms and equipment for the purpose of enhancing the commercial value of the logo. Once member institutions place the NCAA logo on its uniforms, manufacturers

**2.** Bylaw 12.5.5 provides:

A student-athlete may use athletics equipment or wear athletics apparel that bears the trademark or logo of an athletics equipment or apparel manufacturer or distributor in athletics competition and pre- and postgame activities (e.g., celebrations on the court, pre- or postgame press conferences), provided the following criteria are met. [Violations of this bylaw shall be considered institutional violations . . .; however, they shall not affect the student-athlete's eligibility]:

 (a) Athletics equipment (e.g., shoes, helmets, baseball bats and gloves, batting or golf gloves, hockey and lacrosse sticks, goggles and skis) shall bear only the manufacturer's normal label or trademark, as it is used on all such items for sale to the general public, and

 (b) The student-athlete's institution's official uniform (including numbered racing and warm-ups) and all other items of apparel (e.g., socks, head bands, T-shirts, wrist bands, visors or hats, swim caps and towels) shall bear only a single manufacturer's or distributor's normal label or trademark (regardless of the visibility of the label or trademark), not to exceed 2 ¼ square inches in area (i.e., rectangle, square, parallelogram) including any additional material (e.g., patch) surrounding the normal trademark or logo.

such as Adidas will be forced to pay royalties to the NCAA in order to include the NCAA logo on replica uniforms sold to end consumers.[3]

## II. LEGAL STANDARDS

■ A Rule 12(c) motion for judgment on the pleadings is governed by the same standards as a Rule 12(b)(6) motion to dismiss. *Mock v. T. G. & Y.*, 971 F.2d 522, 528 (10th Cir.1992); *Bushnell Corp. v. ITT Corp.*, 973 F.Supp. 1276, 1280 (D.Kan. 1997). In reviewing a defendant's Rule 12(c) motion, the court assumes the veracity of the "well-pleaded factual allegations" in the complaint and draws all reasonable inferences in the plaintiff's favor. *Shaw v. Valdez*, 819 F.2d 965, 968 (10th Cir.1987); *see Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). The court may dismiss a case for failure to state a claim only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its theory of recovery that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## III. DISCUSSION

### A. Antitrust Claims

■ Adidas claims that the NCAA has unreasonably restrained trade and engaged in a group boycott in violation of § 1 of the Sherman Act, and has attempted to monopolize in violation of § 2 of the Sherman Act. To prevail under § 1 of the Sherman Act, a plaintiff must prove that the defendant (1) participated in an agreement that (2) unreasonably restrained trade in the relevant market. *See Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 959 (10th Cir.1990). To prevail on a section 2 claim, a plaintiff must establish the following elements: (1) "the possession of monopoly power in the relevant market," and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The NCAA assets that Adidas has failed to state a claim under either § 1 or § 2 of Sherman Act, and that some or all of Adidas' antitrust claims should be dismissed on seven different grounds: (1) the enforcement of Bylaw 12.5.5 is not a commercial activity; (2) Adidas has not alleged that it suffered an "antitrust injury;" (3) Adidas has not alleged a plausible or legally cognizable relevant market; (4) Adidas has not alleged concerted action; (5) Bylaw 12.5.5 is reasonable as a matter of law; (6) Adidas has failed to show that the NCAA has monopoly power; and (7) Adidas has failed to allege facts showing that the NCAA acted with the requisite intent to monopolize. The court agrees that Adidas has failed to allege a plausible or legally cognizable relevant market; therefore, the court will not address the NCAA's six alternative grounds for dismissal.

■ The first step in an antitrust analysis is defining the relevant market or markets. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir.1979); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir.1978). "Market definition is 'essential' to claims under § 1 and § 2 [of the Sherman Act] in which the rule of reason is applied." *Joplin Enters. v. Allen*, 795 F.Supp. 349, 352 (W.D.Wash.1992) (citing *Gough*, 585 F.2d at 389). Without defined relevant markets, there is no way for a court to determine whether a defendant has restrained trade in violation of § 1 or to measure a defendant's ability to lessen or destroy competition in violation

---

**3.** Adidas reasons that a replica uniform will not be "authentic" and, therefore, not desirable to consumers unless it contains all the elements of the uniform worn in competition, which, in time, may include the NCAA logo.

§ 2. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Joplin Enters.,* 795 F.Supp. at 352 (citing *Gough,* 585 F.2d at 389).

■ In this case, it is Adidas' burden to properly plead the boundaries of the alleged relevant market or markets. *See Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.,* 614 F.2d 832, 840 (2d Cir.1980). However, an antitrust plaintiff may not "define a market so as to cover only the practice complained of, this would be circular or at least result-oriented reasoning." *Redmond v. Missouri W. State College,* No. 84–6139–CV–SJ–6, 1988 WL 142119, at *2 (W.D.Mo. Nov.2, 1988). Rather, a relevant market must be defined by "the interchangeability of use or the cross-elasticity of demand between the product [in question] and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). "In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of trade or commerce,' monopolization of which may be illegal." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 394–95, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). "Where [an antitrust] plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436–37 (3d Cir.1997) (collecting cases); *see also TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1025 (10th Cir.1992) (affirming district court's dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined too narrowly); *Tower Air, Inc. v. Federal Exp. Corp.,* 956 F.Supp. 270, 280 (E.D.N.Y.1996) ("Because a relevant market includes all products that are reasonably interchangeable, plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,* 909 F.Supp. 162, 171–72 (S.D.N.Y.1995) (dismissal for failure to plead a valid relevant market; plaintiffs failed to define market in terms of reasonable interchangeability or explain rationale underlying narrow proposed market definition); *Re–Alco Indus. v. National Ctr. for Health Educ., Inc.,* 812 F.Supp. 387, 391–92 (S.D.N.Y.1993) (dismissal for failure plead a valid relevant market; plaintiff failed to allege that specific health education product was unique or explain why product was not part of the larger market for health education materials); *E. & G. Gabriel v. Gabriel Bros., Inc.,* No. 93 Civ. 0894, 1994 WL 369147, at *2–4 (S.D.N.Y. July 13, 1994) (dismissal for failure to plead valid relevant market; proposed relevant market legally insufficient because it clearly contained varied items with no cross-elasticity of demand); *Theatre Party Assocs., Inc., v. Shubert Org., Inc.,* 695 F.Supp. 150, 153 (S.D.N.Y.1988) (dismissing complaint after concluding plaintiff "narrowly defined the market in an attempt to conform the alleged market to the facts of the present case."). In order to survive the instant motion to dismiss, Adidas must allege a relevant market that includes all advertising vehicles that are reasonably interchangeable with NCAA promotional rights on athletic apparel.

■ For purposes of its § 1 claims, Adidas alleges that the relevant markets include:

(a) the market for the sale of Promotional Rights by an individual Member Institution or by Member Institutions on the athletic apparel and footwear of a Member Institution or

Member Institutions used in connection with NCAA-controlled intercollegiate athletics in which the Member Institutions participate; (b) the markets for the sale of college uniforms and related athletic apparel and footwear; and (c) the markets for the sale of athletic apparel and footwear to the general public.

For purposes of its § 2 claims, Adidas alleges that the relevant market is "the market for the sale of NCAA Promotional Rights." The court first will address the relevant market common to all claims: the market for the sale of NCAA Promotional Rights. The NCAA contends that an alleged relevant market consisting solely of the sale of promotional rights by NCAA member institutions on athletic apparel used in intercollegiate activity is not a plausible relevant market. According to the NCAA, Adidas has intentionally gerrymandered and narrowed its proposed relevant market in an effort manufacture a prima facie antitrust injury.

In response, Adidas argues that there exist no other advertising vehicles that are interchangeable with NCAA promotional rights on athletic apparel used in intercollegiate competition. Adidas' complaint states that the market for NCAA promotional rights on athletic apparel used in intercollegiate competition is a "unique market for advertising and promotion products and brand names." In support of this statement, Adidas' complaint alleges that (1) "sponsorship agreements [with NCAA member institutions] are a critical component of adidas' marketing strategy, and that of its competitors," (2) sponsorship agreements drive demand "in the market for adidas' athletic footwear and apparel," (3) "the fact that the brand is worn by collegiate athletes in actual competition 'authenticates' the brand as a high quality athletic brand, with products that serve the high performance needs of these athletes," and (4) "the visibility of adidas' trademarks on the playing field ... translates into public exposure that is in fact more valuable than traditional commercial advertising in terms of marketing value and effectiveness."

Adidas' allegations establish, for purposes of this motion, that NCAA promotional rights are excellent advertising vehicles for increasing demand for athletic apparel and footwear. They do not, however, establish that such promotional rights are, in and of themselves, a relevant market for purposes of Adidas' instant antitrust claims. The allegations in Adidas' complaint fail to define the relevant market in terms of interchangeability and cross-elasticity of demand. As a result, Adidas has failed to explain or even address why other similar forms of advertising, namely sponsorship agreements with teams or individuals competing in the National Football League, the National Basketball Association, the Women's National Basketball Association, Major League Baseball, Major League Soccer, or the Olympics, are not reasonably interchangeable with NCAA promotion rights or sponsorship agreements. Similarly, Adidas has not explained why sponsorship agreements with teams or individuals in any of the above organizations would fail to satisfy Adidas' goals of enhancing the "visibility of adidas' trademarks on the playing field" and authenticating Adidas as a "high quality athletic brand, with products that serve the high performance needs of these athletes." Accordingly, the market for the sales of NCAA promotional rights cannot be considered a relevant market for purposes of Adidas' instant claims under § 1 or § 2 of the Sherman Act.

 Adidas also alleges in Counts I and II of its complaint that the NCAA's unreasonable restraint of output in the NCAA Promotional Rights "market" has "caused injury to competition in ... the market for the sale of Sports Merchandise." Adidas defines the "sports merchandise" market as containing "markets for the sale of certain athletic uniforms, related athletic apparel and athletic footwear to consumers in which adidas competes." The question for the court is

whether the markets for the sale of "certain athletics uniforms, related athletic apparel and athletic footwear to consumers" are plausible relevant markets for purpose of Adidas' § 1 claims. The court concludes that they are not.

In its motion to dismiss, the NCAA argues that "adidas has not even attempted to allege that Bylaw 12.5.5 regulates, monopolizes, or has any effect at all on ... these markets." According to the NCAA, the markets for the sale of "certain athletic uniforms, related athletic apparel and athletic footwear to consumers" are, therefore, "not "relevant markets" for adidas' antitrust claims, all of which are based on, and limited to, the effect that Bylaw 12.5.5 allegedly has on competition for space on players' uniforms and other apparel." Adidas failed to respond to the NCAA's argument. This failure to respond is not surprising as Adidas' complaint does not contain factual allegations sufficient to support the conclusory allegation that the NCAA's enforcement of Bylaw 12.5.5 restricts the "markets for the sale of certain athletic uniforms, related athletic apparel and athletic footwear to consumers in which adidas competes." "Although the modern pleading requirements are quite liberal, [Adidas] must do more than cite relevant antitrust language to state a claim for relief. [It] must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the [NCAA] violated those laws are insufficient." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 755–56 (10th Cir.1999). Accordingly, the court concludes that Adidas' allegation that the NCAA's enforcement of Bylaw 12.5.5 caused injury to competition in the "markets for the sale of certain athletic uniforms, related athletic apparel and athletic footwear to consumers in which adidas competes" is insufficient.

As stated above, without properly defined relevant markets, there is no way for the court to determine whether the NCAA has restrained trade or output in violation of § 1 or to measure the NCAA's ability to lessen or destroy competition in violation

of § 2. The court, therefore, grants the NCAA's motion for judgment on the pleadings as to Adidas' antitrust claims.

### B. State Law Claims

██ Adidas also claims that the NCAA interfered with Adidas' contractual relations and prospective economic advantages, breached a contract between the parties, and violated public policy and its own bylaws and rules, all violation of state law. Pursuant to Tenth Circuit and Kansas case law, the court concludes that the NCAA lacks capacity to be sued for state law claims, and that Adidas' state law claims must be dismissed.

The NCAA is a voluntary unincorporated association. *See Jones v. Wichita State Univ.*, 698 F.2d 1082, 1083 (10th Cir.1983). "As such, it is regarded under Kansas law as an aggregate of its members, and lacks the capacity to sue or to be sued in its own name." *University of Texas v. Vratil*, 96 F.3d 1337, 1339 (10th Cir.1996) (citing *Frey, Inc. v. City of Wichita*, 11 Kan. App.2d 116, 121, 715 P.2d 417 (1986)). Unincorporated associations such as the NCAA may be sued in their own names for purposes of enforcing a federal right, *see* Fed.R.Civ.P. 17(b)(1), and may sue or be sued where a statute so provides, *see Kansas Private Club Ass'n v. Londerholm*, 196 Kan. 1, 3, 408 P.2d 891 (1965) ("It is the general rule to which this jurisdiction has long adhered, that in the absence of a statute to the contrary, an unincorporated association is not a legal entity and can neither sue nor be sued in the name of the association."). However, the court concludes that neither of these exceptions save Adidas' state law claims. The court, therefore, grants the NCAA's motion for judgment on the pleadings as to Adidas' state law claims.

IT IS, THEREFORE, BY THE COURT ORDERED that defendant National Collegiate Athletic Association's motion for judgment on the pleadings (Doc. 87) is granted.

The case is now closed.

The clerk shall mail copies of this order to counsel of record.

**IT IS SO ORDERED.**