**R.C. DICK GEOTHERMAL CORPORATION, Plaintiff,**

v.

**THERMOGENICS, INC., a corporation, Pacific Energy Corporation, a corporation, Resources Investment Company, a corporation, Hughes Aircraft Company, Inc., a corporation, Callon Petroleum Company, a corporation, Geothermal Resources International, Inc., a corporation, L.A. Hyland, Robert S. Reed, and John S. Callon, Defendants.**

No. C–79–3814 EFL.

United States District Court, N.D. California.

Aug. 28, 1985.

Allan N. Littman, Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff.

James L. Hunt, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants.

MEMORANDUM OPINION

LYNCH, District Judge.

This lawsuit began as a complex antitrust action with several pendant state claims and counterclaims. The parties voluntarily dismissed the pendant claims, leaving only the Sherman Act antitrust claims. As the plaintiff alleges in its complaint, the defendants have combined and conspired with each other in violation of Section 1 to restrain trade in the development, production and use of geothermal steam located on the plaintiff's property. In addition, the plaintiff alleges attempted monopolization and conspiracy to monopolize under Section 2.

## I. FACTUAL BACKGROUND

At the heart of this controversy is 1,100 acres of land located in the Geysers district of Sonoma County, California (the "Dick property"). The land was owned originally by Alex and Audrey Rorabaugh. The Rorabaughs leased the land in 1964 to R.C. Dick. Shortly thereafter, Dick transferred the lease to R.C. Dick Mercury Mines Corporation ("Mercury Mines"). Through a series of intra-corporate assignments, a second R.C. Dick company, R.C. Dick Geothermal Corporation, acquired the lease and purchase option to the Rorabaugh land. In 1979, R.C. Dick Geothermal Corporation purchased the 1,100 acres.

### A. The Parties

For more than a decade prior to the purchase of the Rorabaugh property, R.C. Dick companies leased the land to geothermal developers. In 1966, Mercury Mines signed a lease with Geothermal Resources International ("GRI"). Under this agreement, Mercury Mines assigned its rights to minerals and steam extracted from the property in return for royalty payments on the land. After four years of development, GRI transferred its steam rights to Resources Investment Company ("RIC"), a wholly-owned subsidiary of Hughes Aircraft Company ("Hughes").[1] GRI retained only a royalty interest in the Dick property. A second Hughes subsidiary, Thermogenics, Inc. ("TGI") assumed the development rights from RIC in 1973. TGI held the steam and mineral rights on the Dick property until 1982, when Hughes sold its TGI subsidiary and the rights to the Dick property back to GRI.

Adding another layer to the complex development scheme, both GRI and Hughes contracted separately for services associated with the development of the Dick property's steam resources. Between 1971 and 1977, Pacific Energy Corporation ("PEC"), a company owned by John Callon, operated the Dick property wells.[2] PEC subcontracted, in turn, with another Callon subsidiary, Callon Petroleum, for the supervision of drilling activities on the Dick property. After 1977, TGI operated the Dick property and retained the Callon companies only as consultants.

### B. The Complaint

The plaintiff has presented the Court with several different theories of antitrust

---

**1.** The plaintiff disputes the validity of the GRI–RIC transfer, arguing that the sublease under which GRI controlled the property prohibited assignment without the express permission of Mercury Mines. The plaintiff, however, has not pursued this contract claim as part of its federal court case. Therefore, the Court is unable to rule on the validity of the GRI assignment. Such a decision, however, is not necessary to an adjudication of the plaintiff's antitrust claims. Regardless of whether GRI breached its Mercury Mines sublease agreement when it transferred its interests to RIC, both parties agree that

other than its retained royalty interest in the Dick property, GRI left the steam development market entirely in 1970. GRI did not participate further in the market for geothermal steam until 1980 and was not involved with the Dick property until 1982.

**2.** In 1973, PEC negotiated a contract with PG & E to construct Unit 15, a 55 megawatt power plant. Located on the northern portion of the Dick property, Unit 15 has been operating since 1979.

conspiracy. It has been difficult, even during the trial, to get the plaintiff to commit to a definitive set of allegations concerning the defendants' anticompetitive conduct. Based on the complaint and subsequent motions, the following represents what this Court finds the plaintiff's complaint to allege:

### 1. Section 1

Construing the complaint in its broadest sense, the plaintiff alleges a multipurpose conspiracy. First, the plaintiff alleges that the defendants conspired to obtain control of the Dick property and other geothermal steam rights. The plaintiff also alleges that the defendants conspired to delay or to avoid exploitation of steam resources on this property. In a circular fashion, the plaintiff alleges that the collusion to suppress production directly promoted the interests of the defendants' land-acquisition conspiracy by artificially reducing the price of steam rights on land adjacent to the Dick property.

The plaintiff alleges three anticompetitive effects from these conspiracies. First, existing steam resources were not adequately developed on the 800 acres that supplied generating power to PG & E's Unit 15. Second, the plaintiff alleges that as a result of the conspiracy potential steam resources located on the 800 acre "Culver Baer" portion of the Dick property were not developed, despite the fact that such development was technically and economically feasible. A third ramification of the conspiracy, which the plaintiff suggests in its complaint and has asserted at trial, was to devalue steam rights on the neighboring properties.

### 2. Section 2

In addition to its Section 1 allegations of conspiracy to restrain the development and production of geothermal steam, the plaintiff also contends that the defendants conspired to and attempted to monopolize the market for geothermal steam in violation of Section 2 of the Sherman Act. Relying on its Section 1 allegations and injuries, the plaintiff argues that the defendants have sought to monopolize the market for geothermal steam located within one and a half to two miles of PG & E's Unit 15

## II. PROCEDURAL HISTORY

The procedural history of this lawsuit is long and complex. The plaintiff first filed suit in 1979, claiming a violation of Section 1 and two pendant state claims for breach of contract against the defendants. The plaintiff amended its complaint in 1980 to add a Section 2 cause of action and additional state claims. The plaintiff also added defendants at that time.

### A. Judge Weigel's Order for Summary Judgment

In January 1982, Judge Weigel granted the defendants' motion for summary judgment on the plaintiff's Sherman Act claims and dismissed the pendant actions as lacking jurisdiction. In his lengthy order, Judge Weigel considered the plaintiff's contention that a suppression of production constituted a *per se* offense under Section 1. The Judge rejected that argument on two grounds. First, he held that the defendants' alleged conduct did not fit into any of the *per se* categories identified by the Supreme Court. Finding that a vertical assemblage of title holders was unlikely to have a "pernicious effect on competition," Judge Weigel refused to find that the defendants' alleged conduct constituted a group boycott. Second, Judge Weigel also refused to expand the scope of *per se* liability in order to reach a vertical combination to suppress production.

Holding that the plaintiff's Section 1 claim must be tested under the rule of reason, Judge Weigel proceeded to consider whether the plaintiff had proved actual harm to competition as required by *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290 (9th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). Judge Weigel, after examining the record before him on summary judgment, concluded that throughout the relevant period competition in the geothermal steam market intensi-

fied. Balancing the defendants' need to participate in joint exploitation of geothermal resources against the plaintiff's unproved allegations of anticompetitive effect, the Court held that no Section 1 claim could be made.

Judge Weigel also granted the defendants' motion for summary judgment on the plaintiff's Section 2 claims. In assessing this cause of action, the Court defined the relevant market as the entire Geysers area. The Judge rejected the plaintiff's proposed two-mile geographic market as "mechanistically defined." The market, as determined by that area in which the strength of competitive forces are felt, was defined to include those steam properties where a steam buyer, such as PG & E, could purchase steam. The defendants' competitors, therefore, included all existing and potential suppliers of steam throughout the entire Geysers area.

Within the Geysers area, Judge Weigel found no evidence that the defendants had monopoly power. At most, the defendants had an 8.5 percent share of the geothermal steam market in the Geysers. Such a market share could not, as a matter of law, support the plaintiff's contention that the defendants could exclude competition or control prices.

On the plaintiff's final antitrust claims, attempt and conspiracy to monopolize, Judge Weigel held that the plaintiff failed to allege any facts upon which a reasonable inference of the required intent to control prices or destroy competition could be predicated. The conduct complained about by the plaintiff, including breach of lease contracts, attempt to eliminate the plaintiff from the property title chain and attempt to purchase the property without disclosing its true value, were neither threatening to competition or clearly exclusionary. In addition, the Court held that the plaintiff failed to allege facts from which the defendants' specific intent to monopolize could be inferred.

Shortly after the Court granted the defendants' motion and dismissed the pendant state claims, Judge Weigel disqualified himself and vacated his order. After assignment to this Court, the defendants made a motion to reinstate Judge Weigel's order. The Court denied this motion on August 11, 1982.

B. Orders By This Court

As is true of many complex antitrust cases, this litigation has benefited from partial summary adjudication and severance of issues for trial. As each of these separate decisions has shaped the final resolution of the case, the Court takes this opportunity to summarize its holdings and explain its decisions fully.

1. Relevant Market

A threshold issue to be resolved in this litigation was the determination of the relevant market. *See Gough v. Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir.1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). Such an analysis was useful in assisting the Court's analysis of the relationship of the parties alleged to have conspired in restraint of trade. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 301 n. 66 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). In some cases, such as this one, the determination of the relevant market is a question of law. *See Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1387–88 (9th Cir.1981), cert. denied, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981).

■ Consistent with existing Supreme Court authority, the Court defined the relevant market as that grouping of commodities considered by consumers to be reasonably interchangeable for the same purpose. *See United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). *See also* L. Sullivan, *Handbook of the Law of Antitrust* 41 (1977) [hereinafter cited as Sullivan, *Handbook*]. In the current case, the parties agreed that the relevant product market was that for geothermal steam de-

velopment.[3] [Defendants' memo in response to Court's Sept. 23, 1982 request at 7.] The parties, however, disagreed as to the scope of the relevant geographic market. The plaintiff contended that the geographic market could include only those geothermal wells situated within two miles of an steam generating unit and not otherwise committed to a buyer. The defendants argued, conversely, that the geographic market for geothermal steam necessarily included the entire resource pool from which competitors for geothermal steam could draw.

■ In its Order of June 6, 1983, this Court held that, as a matter of law, the relevant geographic market encompassed the Geysers-Calistoga KGRA (the "Geysers"), a 378,000 acre area located in Sonoma and Lake counties and recognized by Congress for its steam potential.[4] It is clear on the facts presented here that this entire region constitutes the "arena" within which the strength of competitive forces is measured. *Woods Exploration & Producing Co. v. Aluminum Company of America*, 438 F.2d 1286, 1304 (5th Cir.

1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972).

The Court determined the relevant geographical market in part by looking at the area in which a purchaser could reasonably turn for product. *Gough*, 585 F.2d at 389. Assuming a reduction in supply at one location, buyers of geothermal steam, predominantly electric utilities, could look to steam producers throughout the Geysers area to satisfy the shortfall. Utilities would not necessarily need to rely on existing facilities but could instead build additional generating units close to replacement steam resources.

As a second aspect of its geographic market analysis, the Court assessed suppliers within the Geysers. The evidence before the Court indicated that sellers or potential sellers of geothermal steam looked to the entire Geysers area as a source of steam. *See, e.g., Woods*, 438 F.2d at 1305; *Denver Petroleum Corp. v. Shell Oil Co.*, 306 F.Supp. 289, 304 (D.Colo. 1969) (including the entire resource field as the relevant geographic market). While it is true that once a seller locates its wells it is restricted by the transportation limits of

---

3. Faced with a geographic market much larger than what it originally proposed, the plaintiff has attempted to repudiate its prior agreement as to the product market. While it steadfastly refused to submit to the Court an alternative product submarket, the plaintiff urged the Court to adopt any of several suggested alternatives. As stated in the plaintiff's closing brief: "We do not contend that the markets are limited to 16,000 acres, 21,500 acres, 51,500 acres, 1977 leaseholdings, or any of defendants' other red herrings ... but we do contend that distinctions in product quality must be observed." [Plaintiff's closing brief at 3.]

Such unsupported admonitions as to the implications of product quality on product interchangeability, however, are of little value to the Court. As held by the Ninth Circuit in *Gough v. Rossmoor Corp.*, the plaintiff has the burden of alleging and proving the relevant market. 585 F.2d 381, 389 (9th Cir.1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). Failure to sustain this burden entitles the defendants to summary judgment in Section 1 rule of reason cases. *Id.* Despite this obligation, the plaintiff has repeatedly declined to commit itself to a cognizable and defined product market.

Nor do such unsubstantiated statements create a triable issue of fact on the relevant prod-

uct market. Rule 56 of the Federal Rules of Civil Procedure requires that when a motion for summary judgment is made, an adverse party may not rest upon the allegations of its pleadings but must instead set forth specific facts showing that there is a genuine issue for trial. *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

4. 30 U.S.C. 1001(e) defines known geothermal resource area ("KGRA") as an area in which the geology, nearby discoveries, competitive interests or other facts indicate that the prospect for extraction of geothermal steam is good enough to warrant investment. The Geysers is one of several areas of hot springs and fumaroles which occur along a section of a long fault zone in the Mayacamas Mountains in northern California. The geothermal reservoir is of the vapor-dominated type and extends over an area 13.3 miles by 5.3 miles. The source of thermal energy is believed to be a magmatic intrusion which lies at about 32,800 feet. The steam producing areas are highly fractured regions with near-vertical orientation. *Sourcebook on the Production of Electricity from Geothermal Energy* [Exhibit 9].

the steam resource, the market power of that seller can be evaluated only in light of the "alternatives reasonably available to persons taking advantage of the market." *Venture Technology, Inc. v. National Fuel Gas Co.*, 1980–1 Trade Cas. (CCH) ¶ 63,780 (W.D.N.Y.1981) (only by considering all locations where a the plaintiff could reasonably have located its wells and begun production can one measure the degree of power possessed by actors in the market and the level of competition), *rev'd on other grounds*, 1982–2 Trade Cas. (CCH) ¶ 64,869 (2d Cir.1982). In this situation, the geographic market available to a potential entrant before actually drilling wells was the entire Geysers.

The Court found, therefore, that the Geysers was the relevant geographic market. While this is contrary to the very narrow market proposed by the plaintiff, the Court is not compelled to accept whatever market the plaintiff suggests as fitting most persuasively with its contention that its power to compete effectively has suffered injury. *Gough*, 585 F.2d at 389.

### 2. Relationship of the Parties

One of the most difficult aspects of this case concerned the alignment of the parties, both as to the Geysers market and the Dick property. Part of this difficulty stemmed from the unique nature of land and its ability to be transferred in part by a party, subject to retained royalty or rent interests. Part of the problem stemmed from the fact that the parties disagreed substantially about their relationships. The plaintiff contended throughout this litigation that the defendants were horizontal competitors, both on the Dick property and throughout the Geysers market for geothermal steam. As evidence of this horizontal relationship, it pointed to the fact that GRI and PEC were joint steam operators on the Filley property. The defendants rejected the plaintiff's characterization

and instead argued that they were vertically related.

As indicated in its July 23, 1984 Order Re Request for Status Conference, this Court adopted Judge Weigel's position and held that the parties were not competitors in the Geysers market, but rather sequential title holders in a single piece of geothermal property.[5] Whether this kind of sequential arrangement along a vertical chain of title is most aptly described by the term "vertical" is uncertain. Generally, such terminology is used to describe firms operating at different levels of the manufacturing process. What is clear, however, is that the parties were never horizontal competitors in relation to the development of the Dick property. The uncontroverted facts before the Court showed that GRI left the geothermal market after transferring its interests in the Dick property to Hughes. Hughes, in turn, left the Geysers market after it sold TGI back to GRI. As for the plaintiff, the evidence proves that R.C. Dick Geothermal Corporation never actually developed one single geothermal property in the Geysers or elsewhere.

### 3. Rule of Reason

Given that the parties constituted a vertical chain of title holders, each individually developing the Dick property at different points in time, the Court had to assess whether their collateral agreement on production levels was a *per se* violation of Section 1 or whether their conduct should be analyzed under the rule of reason.

As held by the Ninth Circuit in *Cascade Cabinet Co. v. Western Cabinet and Millwork, Inc.*, 710 F.2d 1366, 1370 (9th Cir. 1983), the Supreme Court has recognized four categories of restraints for which *per se* liability can be established: horizontal and vertical price fixing, horizontal market division, group boycotts or concerted refusals to deal, and tying arrangements. Other conduct not included in these four catego-

---

**5.** An alternative description of the defendants' relationship would be a joint venture. None of the parties adopts this position, however, so the Court declines to expand on such an alternative.

Suffice it to say, however, that the Court's analysis would be the same for a joint venture as for a vertical arrangement.

ries can be considered illegal *per se* only if the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output. *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1052 (9th Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983).

The plaintiff contended that it qualified for *per se* analysis under two of the categories listed above. First, it argued that the defendants' joint conduct constituted a vertical boycott in order to prevent the development of the Dick property and other adjacent properties. Second, it contended that agreements among vertically related entities to suppress production were *per se* unlawful and that the defendants' concerted action to limit geothermal steam development on the Dick property violated Section 1 as a matter of law.

The law of this Circuit did not support the plaintiff's contention that a boycott among the defendants was illegal *per se*. As held by the Ninth Circuit in *Gough*, an alleged boycott between vertically related defendants is not *per se* unlawful. 585 F.2d at 387. *See also Calculators Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1337 n. 2 (9th Cir.1983) (any "group boycott" consisting of a vertical agreement is subject to the rule of reason).

Nor could the alleged suppression of production among vertically arrayed title holders to a single property justify the creation of a new *per se* category. Unlike an agreement among horizontal competitors to limit output at several locations, which would have the same effect as an agreement to set price, a decision by several different operators to develop a resource at a specific level is a necessary prerequisite to its exploitation. As has been made clear by the Supreme Court in several recent decisions, the *per se* rule may not be applied to situations where the conduct in question is necessary to achieve significant efficiencies or where a "pernicious effect upon competi-

tion" is absent. *NCAA v. Board of Regents of the University of Oklahoma*, —— U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)[6]; *Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

In its Order of June 16, 1983, therefore, the Court rejected the plaintiff's arguments and held that conduct between vertically arrayed title holders did not fall within an established *per se* category. Nor, the Court held, was the conduct complained of sufficiently pernicious to competition so as to allow an addition to the limited *per se* list. Cognizant of its lack of judicial experience with the challenged conduct and its difficulty in classifying the relationships between the parties, the Court declined to apply the *per se* rule. *See United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972) ("It is only after considerable experience with certain business relationships that courts classify them as *per se* violations.").

### 4. Anticompetitive Effect

Conduct that is not conclusively presumed to be illegal under the *per se* rule must be proved to be unreasonable under the rule of reason test. *Cascade*, 710 F.2d at 1373. The elements of a cause of action for an unreasonable restraint of trade under the rule of reason analysis are: (1) an agreement among two or more persons; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition. *Kaplan*, 611 F.2d at 290. The primary considerations in determining whether a restraint of trade is unreasonable are whether the intent of the restraint is anticompetitive and whether the restraint itself has significant anticompetitive effects. *Id.* at 291.

---

**6.** See *infra* Court's discussion of the *NCAA* case in response to plaintiff's motion for reconsidera- tion.

■ Thus, to prevail on its Section 1 claim, the plaintiff had to prove that the defendants' conduct had "a substantially adverse effect on competition in the relevant market." *Ron Tonkin*, 637 F.2d at 1388. This required evidence of actual, not merely speculative, impact upon competitive conditions in the relevant market. *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 804 (9th Cir.1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). It was not enough for the plaintiff to complain of business losses; economic injury to a competitor does not equal injury to competition. *Cascade*, 710 F.2d at 1373.[7]

Acknowledging this threshold burden placed on the plaintiff, the Court severed the issue of anticompetitive effect for immediate trial. Were the plaintiff to prevail on this issue, then the Court would hear the remaining issues of conspiracy, reasonableness and damages.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Shortly after the Court's order severing the issue of anticompetitive effect for trial, the defendants moved for summary judgment contending that the plaintiff could not, as a matter of law, prove a restraint on competition in either the market for geothermal steam or the land market for geothermal steam rights. For the purposes of this motion only, the defendants stipulated to the plaintiff's claim that they conspired to withhold 30 megawatts of steam from PG & E's Unit 15. The defendants also stipulated to the plaintiff's claim that they knew that the remainder of the Dick land would provide 60 megawatts of additional steam, yet they declined to produce it.

In its November 29, 1983 Order Granting Partial Summary Judgment, the Court held that the plaintiff failed to prove any actual effect upon competition for steam rights in the Geysers market as a result of the al-

leged suppression of steam on the Dick property. The Court, therefore, granted partial summary judgment in favor of the defendants on the allegations of conspiracy in the market for geothermal rights. As substantial issues of fact remained on whether the defendants' alleged suppression of steam on the Dick property had an anticompetitive effect on the price and structure of the market for geothermal steam itself, the Court set this single issue for trial.

In its opinion, the Court indicated that its reasons for granting the defendants' motion would be given in greater detail as part of its post-trial order. The Court, therefore, takes this opportunity to do so.

### A. Market for Steam Rights

As part of its overall allegations of Sherman Act violations, the plaintiff accused the defendants of conspiring to suppress production on the Dick property in order to restrain competition in the market for steam rights. While the plaintiff never argued that the defendants' primary objective was to acquire steam rights at less than their actual value, it did contend that a secondary anticompetitive effect of the defendants' conspiracy to delay development of the Dick property was a lessening of competition in the market for steam rights on adjacent properties in the Geysers. According to the plaintiff, by not developing the Dick property as they should the defendants signaled to other potential steam operators that the geothermal resources in this part of the Geysers were inferior. Such "misinformation" had the effect of devaluing the rights to the Dick property, deterring potential purchasers of steam rights on nearby lands and denying the plaintiff those royalties owed to it under the Dick property lease.

■ In evaluating the plaintiff's claim that the defendants' conduct had an actual and substantial adverse effect on competition in the market for the rights to geo-

---

7. Only when the plaintiff has established that the challenged conduct constitutes a restraint on competition are the defendants required to advance arguments that, on balance, their actions promoted competition. *Cascade*, 710 F.2d at 1373.

thermal steam, the Court focused on a number of structural and conduct aspects including: the percentage of business controlled, the strength of remaining competition, potential barriers to competition and market performance. *United States v. Columbia Steel Co.*, 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948). As discussed below, the record before the Court on summary judgment contained absolutely no evidence supporting the plaintiff's contention that the defendants' alleged suppression of production on the Dick property adversely affected the Geysers market for geothermal steam rights. Given the defendants' insubstantial share of the market for steam rights, the existing and potential competition in that market and the complete absence of any proof supporting the plaintiff's "misinformation" theory, no actual effect upon competition could be proved.

### 1. Market Power

A review of the affidavits submitted by the defendants in support of their motion shows that the defendants lacked substantial power in the market for geothermal steam rights. Such power is a valuable indicia of the defendants' ability to impact competitive conditions in the market. *General Leaseways Inc. v. National Truck Leasing Association*, 744 F.2d 588, 596 (7th Cir.1984); *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 519 F.Supp. 1084, 1088 (N.D.Cal.1981), *aff'd*, 698 F.2d 1011, *cert. denied*, 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983).

The record before the Court showed that each defendant's individual share of steam rights within the Geysers market was insubstantial.[8] Between 1973 and 1981, defendant Hughes (including its wholly-owned subsidiary TGI) and its operator (PEC) had leases or interests on 18,118 acres in the Geysers. This equaled only 4.7 percent of the relevant market.[9] GRI, the third defendant, held leases on 19,313.44 acres, about 5 percent of the market. As compared to other competitors in the market for steam rights, the defendants' market shares were relatively small.[10]

### 2. Market Structure

In addition to making an assessment of the defendants' market power, the Court also examined the structure of the steam rights market. The Court considered the strength of existing competitors, entry opportunities for potential competitors and looked for any indication of an increase in concentration or any other anticompetitive aggregation or exercise of market power. *See Mid-West Underground Storage, Inc. v. Porter*, 717 F.2d 493, 1983–2 Trade Cas. (CCH) ¶ 65,598 (10th Cir.1983).

There was no shortage of actual competitors in the Geysers market for geothermal steam rights. As was evident in the uncontroverted record submitted to the Court, since 1973 many companies have acquired stream rights, both through private sales and public auctions. These companies included Union Oil, Aminoil, Geothermal Kenetics, Phillips Petroleum, Sun Oil Company, Anadarko, Occidental Petroleum, Getty Oil Company, Chevron, McCulloch Oil Company, Shell Oil Company, MSR (Modesto-Santa Clara-Redding) and Natomas. A result of this entry has been a general

---

**8.** The plaintiff urged the Court to combine the market shares of the various defendants and to consider their market power in the aggregate. The record, however, does not support aggregating individual defendant's market shares. With the exception of 1,500 acres (the Filley property) held as a joint venture, there is no evidence that the defendants acted jointly in obtaining or developing steam properties elsewhere in the Geysers.

**9.** In 1981, Hughes disposed of all of its interests in the Geysers except three parcels. These three leases constituted less than 1,500 acres, or .04% of the Geysers. In 1982, Hughes sold its geothermal subsidiary and all of its interests in the Geysers to GRI.

**10.** By contrast, Union Magnathermal-Natomas held rights to 28,767 acres and Aminoil held rights on 28,727 acres within the Geysers.

deconcentration of the steam rights market.[11]

The plaintiff failed to provide any admissible evidence to support its contention that "misinformation" concerning the productivity of the Dick property acted as a barrier to entry within the Geysers steam rights market, even at those locations adjacent to the Dick property. R.C. Dick admitted that he was not misled. Jenkins, the only other steam rights competitor deposed by the plaintiff, stated that he was not misled. Even the plaintiff's expert witness, McNitt, stated that his advice as a geothermal consultant to his clients was not affected by the absence of drilling on the Dick property.[12]

Nor did the plaintiff substantiate its "misinformation" theory with empirical evidence of an effect upon steam rights prices. The only price data introduced by the plaintiff came from two government lease auctions for parcels A1 and B1 (Breshrehan declaration at 11–12). This auction, however, occurred in 1982, more than three years after the plaintiff's lawsuit uncovered the alleged "misinformation." Thus, any price effects from the defendants' conspiracy would have entirely dissipated.

In sum, the plaintiff failed to provide any support for its claim that the defendants' stipulated suppression of 90 megawatts of steam on the Dick property had any anticompetitive effect on the market for steam rights in the Geysers. The uncontroverted record demonstrated that throughout the relevant period and beyond there was active competition among many firms for steam rights within the relevant market. In addition, the plaintiff provided no support for its contention that "misinformation" adversely affected market structure, ease of entry or the price for steam rights in the Geysers.

When no adverse effect on competition can be shown as resulting from alleged restraints, summary judgment is appropriate. *See Ron Tonkin*, 637 F.2d at 1388. The Court, therefore, granted the defendants' motion for summary judgment, finding that the defendants' alleged suppression of geothermal steam on the Dick property had no ancillary anticompetitive effect on the market for steam rights in the Geysers.

### B. Motion for Reconsideration

On August 29, 1984, the plaintiff moved for reconsideration of the Court's ruling on the steams rights aspect of the case. The Court postponed ruling on this issue until the conclusion of the trial on anticompetitive effects in the steam market. The Court now turns to this motion.

The plaintiff asserts two different bases for reconsideration. First, it offers "proof" that the defendants' suppression of steam created misinformation that adversely affected the willingness of developers to enter the Geysers steam rights market. Second, the plaintiff seeks reconsideration of the Court's ruling that the case should be analyzed under the rule of reason in light of the recent Supreme Court ruling in *NCAA v. Board of Regents of the University of Oklahoma*, — U.S. —, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). As discussed below, neither of these arguments convince the Court that its original grant of summary judgment was incorrect. The Court, therefore, denies the plaintiff's motion for reconsideration.

### 1. Offer of Proof

As part of its motion, the plaintiff submits to the Court "proof" that the suppression of steam on the Dick property reduced the value of steam rights on the Dick property and on over 10,000 acres of adjoining

---

**11.** In 1970, only five firms held geothermal steam rights in the Geysers. As of the defendants' motion for summary judgment, that number had increased to 21.

**12.** The plaintiff's only support for its "misinformation" theory consists of inadmissible hearsay contained in R.C. Dick's affidavit that others told him that they were not interested in purchasing steam rights on adjacent tracts because of the limited success of the Dick property's development.

properties. The proof offered to support the plaintiff's "misinformation" theory is yet another theory. According to this model of steam land acquisition, investors value steam rights in proportion to the likelihood of finding commercial steam reserves beneath the land. A potential developer uses the existence of nearby steam production as one factor in assessing the development prospects on any given steam acreage. Specifically, the value of steam rights on lands adjoining the Dick property should be influenced by activities on the plaintiff's land.

■ While such speculation may be valid in theory, the plaintiff still fails to provide testimony from one single developer that investment decisions were in any way influenced by the defendants' alleged suppression. What could be easier, given the large number of bidders competing for steam rights in the Geysers, than to provide a declaration from a "misinformed" developer? Yet, the only evidence submitted by the plaintiff is price information from an auction of federal lands in 1984—long after the plaintiff exposed the alleged conspiracy among the defendants to suppress steam on the Dick property. By 1984, potential bidders, aware of the plaintiff's contentions that "Culver Baer" contained large, unexploited steam reserves, would be able to consider all the relevant factors free of any distortions. The bidding history on this parcel, therefore, cannot provide the proof necessary to show that interested bidders were discouraged from developing nearby properties because of the defendants' suppression and its attendant "misinformation" concerning the value of nearby steam rights.

■ A theoretical model of market behavior, regardless of its logic, is insufficient to sustain the plaintiff's burden of proving an actual and substantial anticompetitive effect resulting from the defendants' alleged conduct. Without one single investor to testify that during the relevant period of the conspiracy he was misled by the "misinformation" resulting from the defendants' alleged conduct, no such actual competitive harm can be proved. *See Knutson v. Daily Review, Inc.*, 548 F.2d 795, 803 (9th Cir.1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).

### 2. The *NCAA* Opinion

■ The plaintiff also urges the Court to reconsider its summary judgment in light of the recent Supreme Court decision in *NCAA v. Board of Regents of the University of Oklahoma*, — U.S. —, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). The plaintiff reads this opinion to hold that agreements between horizontal competitors to suppress production are *per se* unlawful.[13] Therefore, the defendants' conduct should be assessed under a *per se*, rather than a rule of reason analysis. As *per se* liability presumes an impact on competition, the plaintiff argues that it did not need to prove anticompetitive effect and the Court, therefore, erred in requiring it to do so.

The Court rejects the plaintiff's contention and finds that the facts presented in this case clearly distinguish it from *NCAA*. The parties in this case did not enter into a horizontal conspiracy to suppress production on the Dick property. Instead, the defendants are related through a vertical chain of title to a single property on which they developed steam resources. There is no evidence before the Court that the defendants were horizontal competitors who entered into this project to fix prices, divide markets or otherwise restrain competition within the relevant market. *See, e.g.,*

---

**13.** This Court rejects the plaintiff's contention that *NCAA* supports a *per se* rule even where the plaintiff alleges a horizontal cartel. The Supreme Court in *NCAA* adopted a rule of reason analysis in evaluating the defendant's conduct. It justified such a position because the nature of intercollegiate athletics required some restraints on competition to make that recreational product available at all. *NCAA*, — U.S. —, 104 S.Ct. at 2960–62. The Court then went on to rule that the pro-competitive justifications stated by the NCAA for its broadcasting cartel did not, on balance, outweigh the anticompetitive effect of the rule's suppression of output and horizontal price fixing. *Id.* 104 S.Ct. at 2971.

*United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). *Per se* analysis, therefore, is not appropriate.

As the plaintiff has provided neither new evidence of an actual anticompetitive effect on the market for steam rights nor new case authority requiring a reassessment of its earlier ruling granting the defendants' motion for partial summary judgment, the Court denies the plaintiff's motion for reconsideration.

## C. The Market for Steam

The defendants also moved for summary judgment on the issue of whether the plaintiff proved that the defendants' alleged suppression of production had an anticompetitive effect on the Geysers market for geothermal steam. At the time of the motion, the plaintiff provided some empirical evidence that prices for geothermal steam throughout the Geysers rose during the period of the alleged suppression. The plaintiff contended that this price increase resulted from the suppression of steam on the Dick property. The defendants controverted this assertion. As there remained a substantial issue of material fact as to whether the defendants' conduct affected the price for geothermal steam, the Court denied the motion for summary judgment as to the market for steam.

## IV. THE TRIAL

What remained for trial was the single issue of whether, by a preponderance of the evidence, the plaintiff could prove an actual and substantial harm to competition resulting from the defendants' decision to develop the Dick property as they did. It is this single issue to which the Court now turns.

To simplify the litigation, the Court adopts two assumptions. First, the Court assumes that the defendants agreed to limit steam production on the plaintiff's property. Second, the Court accepts the plaintiff's quantification of this limitation at 90 megawatts of steam. This is not to assume that in the absence of the conspiracy that additional steam from the Dick property would have been developed and sold; it only places a limit on the amount that the plaintiff contends that the defendants suppressed.

■ To assess the alleged conspiracy's effect on the market for geothermal steam, the Court must evaluate the market's structure, conduct and performance during the relevant period.

## A. Market Structure

■ In assessing the geothermal steam market's structure, the Court focuses on those basic characteristics that have persisted over a substantial period of time. Sullivan, *Handbook*, at 24. This includes the degree of seller or producer concentration, the degree of product differentiation, the number and organization of buyers and the nature of fixed and marginal costs. In addition, the Court shall examine any barriers to the entry of new firms into the market.

### 1. Supply Side

The Geysers geothermal field is the only dry steam field in the United States. The market for steam began in 1960 with only one 11 megawatt plant. Output reached 78 megawatts in 1970, 396 megawatts in 1973, 980 megawatts in 1980 and 1,310 megawatts in 1983. The field's eventual capacity will probably not exceed 2,300 megawatts.[14]

Between 1960 and 1980, a single developer, Union Oil Company has dominated the sellers' market for geothermal steam. In fact, until 1979, when the defendants began producing steam on the Dick property, Un-

---

**14.** The supply elasticity of steam is low—less than one. Because of the high costs and risks associated with finding and developing steam and the geologic limits on the resource pool, an increase in the price obtained by producers is unlikely to to result in a significant increase in total geothermal capacity.

ion and its joint venturers were the only geothermal steam suppliers operating in the Geysers.

Since 1980, however, the market for geothermal steam has attracted new investors. Beginning with the defendants' Dick project in 1979, several firms, including Aminoil, Shell, Occidental Geothermal, GRI, MCR Geothermal and Geothermal Kenetics, have entered the supply market for geothermal steam.[15] Thus, although supply-side concentration remains relatively high, the clear trend in this market is toward decentralization.

### 2. Demand Side

Steam is a highly desirable source of electric power. It generates electricity efficiently and cheaply. For example, a steam-powered generator produces energy at approximately one-half the cost of a coal, fossil fuel or nuclear-powered plant. As a low cost source of electricity, the only viable substitute for steam-generated electricity is hydroelectric power.

The most distinctive feature of the geothermal market is the presence of chronic and persistent unmet demand.[16] Chronic unmet demand indicates that product prices are below competitive or market-clearing levels. Were buyers' unsatisfied demand translated into sufficient resource prices to encourage greater exploration and drilling, additional supplies would begin to bridge this gap. Where buyers hold substantial power, however, the price is not allowed to rise and suppliers will remain unwilling to exploit those resources necessary to satisfy the unmet demand.

The facts in this case support the testimony of the defendants' expert, Dr. Sweeney, that the Geysers market for geothermal steam has always been characterized by significant market power on the buyers' side. Until 1983, PG & E was the sole purchaser of geothermal steam. Since then five other utilities have entered or have contracted to obtain steam, but PG & E to date retains a virtual monopoly over proved resources. In addition, while it did not actively solicit new steam supplies, PG & E stood ready to purchase any new steam available for sale within the Geysers area at its long-term contract price.

### 3. Barriers to Entry

The Court includes in its analysis of the market structure for geothermal steam in the Geysers the character of any barriers to the entry of new firms. If there are no substantial barriers to entering a market, strong monopolies cannot endure. High profits or opportunities to enter the market with lower costs will attract newcomers.

Where entry by new firms is relatively easy, even an industry which appears to be concentrated may display reasonably competitive conduct and satisfactory market performance. Sullivan, *Handbook* at 27. Potential competitors will tend to discipline the conduct of firms in the market just as would the actual presence of competitors.

There are no quantification measures or overt guides for gauging ease of entry into a market. Therefore, analysis of this structural factor depends on several subsidiary issues, including trade barriers, costs, product differentiation and previous history of entry and exits.

---

**15.** The lag time between the acquisition of steam rights and the drilling of wells necessarily distorts evaluations of supplier concentration. It is not enough to look at those firms currently operating steam generating units to evaluate supply structures. Instead, the factfinder must look at all the supply-side participants at every level of geothermal development to establish the dynamic trends in this market. A company currently purchasing steam rights or drilling exploratory wells may within five years' time be in a position to sell steam to buyers. These "suppliers" must also be considered in describing the Geysers market. As of 1983, 23 companies were actively engaged in obtaining steam rights and in exploring for geothermal steam. These firms will, over time, have the effect of deconcentrating even further the supply of Geysers steam.

**16.** Demand for steam is price inelastic. Despite historical increases in the price, demand for geothermal steam remains relatively unchanged.

Experts who testified for the plaintiff identified four different barriers to entry within the geothermal steam market: two on the demand side and two on the supply side. The first demand-side barrier resulted from long-term contracts for steam purchasers that foreclosed new buyers from obtaining any steam committed under a sale agreement. Thus, new buyers were limited to the uncommitted steam market. The plaintiff's experts also identified a second structural barrier, an "irreversible cost investment" barrier that limited entry of non-integrated new buyers of steam. Since the resale market for steam was not well developed in the Geysers, buyers of steam required access to either unused electric generating capacity or a new facility.

On the supply side, the plaintiff's experts cited two main barriers to entry. First, in-place sellers of steam had an absolute cost advantage over new entrants since good steam was limited and the earlier entrants, according to the doctrine of diminishing resources, could exploit these lower cost resources first. As the field became depleted, new entrants faced a market where additional steam was harder to find and marginally more costly to produce. A second barrier faced by new sellers resulted from the high, irreversible investment costs associated with drilling. These "sunk" costs would, under the plaintiff's theory, discourage entry of new sellers into the market.

■ The Court rejects entirely the plaintiff's theories of demand-side entry barriers. The Court adopts the definition of barriers to entry postulated by Dr. Sweeney: barriers to entry represent the *differences* faced by new entrants when compared to existing firms. On the demand-side, a long-term contract does not afford an existing firm any advantage whatsoever over a new entrant for new purchases of steam. An in-place buyer competes for an additional unit of steam in the uncommitted market on the exact same competitive footing as does a new steam buyer. The old firm is equally foreclosed from purchasing committed steam as is its newly entering competitor. The presence of long-term contracts, therefore, cannot constitute an entry barrier that in some way advantages existing steam buyers.

The integration "barrier" noted by the plaintiff as a demand-side barrier must also be rejected. As testified to by Dr. Sweeney, the advantage obtained by an integrated electric generating company in buying steam is not a barrier to entry. Rather, any integrated company would have an overall advantage as compared to a non-integrated developer of steam, regardless of whether it was already in the Geysers steam market or merely a potential entrant.

On the supply side, the Court also finds the plaintiff's "sunk" costs entry barrier specious. An existing supplier faces the exact same risks associated with drilling a new well (and incurs the same irreversible costs) as does a new entrant seeking to develop additional geothermal resources. No relative advantage exists because an old producer has other wells within the region. Each new development project creates the same degree of risk and high cost regardless of whether the developer is already in the market or is entering the Geysers for the first time.

The only real "barrier to entry" posited by the plaintiff's experts is the absolute cost advantage held by earlier steam suppliers over their late-entering competitors because of the depletable nature of geothermal resources.[17] This "barrier," however, must be qualified. It is not, as argued by the plaintiff's experts, analogous to a patent. Unlike a patent, the cost advantage secured by suppliers due to their

---

**17.** As testified to by all of the experts in this case, geothermal steam is a depletable resource. In the early stages of the geothermal pool's life cycle, it is relatively easy to explore and to discover resources. In addition, improvements in technology during these early years may accelerate development and lower costs. Ultimately as the resource diminishes, reserves become harder to find and the costs of producing additional resources are absolutely higher than those faced by the earlier developers.

early exploitation of a depletable resource is limited. Their cost advantages survive only until the resource supply on which it was obtained is depleted. While a patent holder can produce an unlimited quantity with a lower cost on each item, an owner of a steam reserve holds a cost advantage only until its developed fields deplete.

#### 4. Defendants' Conduct and Structural Effects

While the Court recognizes that the geothermal steam market is concentrated on both the seller and buyer sides and some temporal barriers to entry exist because of the absolute cost advantage obtained by early entrants into the resource pool, the plaintiff has failed to adduce any proof that the defendants' actions created these market conditions or that they have exacerbated these structural imperfections by their alleged conduct.

As to seller concentration, GRI's entry into the market on the Dick property in 1973 broke the virtual monopsony of the Union Oil Company. Thus, the defendant GRI and its subsequent subletees entered the market and helped move it, albeit slightly, toward deconcentration. That the defendants chose to produce steam at a level less than the plaintiff considered economically and technically possible, argues not that the defendants increased concentration through their alleged suppression, but that they did not deconcentrate suppliers even more.

As the smallest producer (2.3 percent market share) among the top four steam suppliers currently operating in the Geysers, the defendants' market power is not sufficiently strong to overcome the dominance of either the larger suppliers parallel to them or the monopolist buyer, PG & E. According to the testimony of Dr. Sweeney, which the Court adopts as its finding, buyers not suppliers of steam hold the market power in the Geysers. As indicated by the persistent unsatisfied market demand for steam, buyers of steam have not allowed prices to rise sufficiently to diminish demand or to encourage new supply. The price level, below the market-clearing price, indicates the ability of the buyers to sustain prices below competitive levels. Such a situation is entirely inconsistent with a finding that suppliers held market power (as defined by a seller's ability to sustain above market-clearing prices).[18]

Nor has the plaintiff proved an adverse effect on entry barriers resulting from the defendants' conduct. The plaintiff's experts cited two different "barriers" erected by the defendants. First, Dr. Adelman testified that suppression on the Dick property would change the risk/profit picture to prospective drillers. The downgrading of the Dick property, according to this theory, would signal to potential entrants that the risk of drilling was greater than before the suppression on those properties adjacent to Dick. As examined in the Court's analysis of the steam lands summary judgment motion, the plaintiff has supplied no evidence that any entrant was affected by such "misinformation." No actual barrier to entry as a result of distortions of risk, therefore, has been proved.

Second, the plaintiff asserts that the defendants' conduct foreclosed as an entry point the Dick property, which might have provided market access to some supplier willing to exploit the otherwise suppressed steam. The barrier posited here, however, is not a function of whether or not steam was suppressed on the Dick property. Instead it is related solely to the willingness

---

**18.** That prices for geothermal steam in the Geysers are greater than marginal cost does not disturb the finding that buyers, not sellers, held the market power. This fact only indicates that the buyers were unable to push prices as low as they could go, they did not have "absolute" market power. Nor does the empirical evidence that prices rose gradually during this period upset the notion that buyers held considerable market power. This rise only demonstrates that as new entrants on the demand side challenged PG & E's initial monopoly, some price increase may have resulted. (Generally PG & E's floor price still dominated—see discussion *infra*.) Still, buyers retained enough power to keep prices well below the market-clearing competitive equilibrium level, as evidenced by the chronic unmet demand.

of the defendants to sell their contractual rights to a potential entrant. The Dick property is an entry point only if the defendants were willing to abandon their enterprise and assign their steam rights to another firm, regardless of whether or not they suppressed steam. The plaintiff, however, provides no evidence that the defendants were ever willing to part with the Dick property. The Dick acres, therefore, cannot be considered an entry point since they were unavailable as a result of the exclusive long-term lease between the plaintiff and GRI. Suppression, therefore, had no effect on market entry based on this theory either.

As to the only "true" barrier to entry posited by the plaintiff, the absolute cost advantage obtained by early steam developers, the plaintiff adduced no testimony on whether this structural aspect was altered in any way by the defendants' alleged conspiracy. Thus, the plaintiff has failed to prove that any barrier to entry in the Geysers market for geothermal steam resulted from or was worsened by the defendants' alleged suppression of 90 megawatts of steam on the Dick property.

## B. Market Conduct

Market conduct describes those strategic choices taken by a firm in response to the conditions it faces in the marketplace. In assessing whether or not a defendant has adversely affected competition, the Court must evaluate such conduct. In its single "conduct" theory, the plaintiff alleges that the defendants' conspiracy to suppress steam adversely impacted the competitive behavior of firms within the Geysers by reducing rivalry among geothermal suppliers.

As agreed to by the parties in order to facilitate the litigation of this matter, the defendants conspired to develop the Dick land at a rate 90 megawatts less than that contended by the plaintiff to be economically and technically possible. Thus, it is a working assumption of the Court that there was no rivalry between the defendants as to the Dick property. Clearly however, a fact "stipulated to" merely to assist the Court in narrowing the issues for trial cannot constitute the proof of anticompetitive conduct as asserted by the plaintiff. For the Court to accept such a tautology would be to circumvent the purpose of this trial: to hear testimony in support of the plaintiff's contention that the defendants' alleged conspiracy reduced competition in the market.

As to the rest of the Geysers market, the plaintiff provided no proof in support of its allegation that competitive rivalry among steam suppliers was reduced as a result of the defendants' conduct. The plaintiff provided no evidence at all that steam suppliers in the Geysers market acted differently than they would have absent the alleged suppression of steam.[19] In fact, the record indicates that rivalry among geothermal steam suppliers, as evidenced by bids for steam rights, increased during the period of the conspiracy.

## C. Market Performance

Performance is another, albeit infrequently used, indicator of competition within a market. Sullivan, *Handbook* at 28. While somewhat difficult to apply, indicia of market performance may provide some insight into whether competitive forces are operating within a given market, and whether competition has been affected by an alleged conspiracy. Within the Geysers geothermal steam market, the plaintiff al-

---

**19.** The plaintiff's only support for its allegation of reduced competitive rivalry relies solely on the "misinformation" theory and its effect on geothermal rights. The plaintiff argues the the defendants' conspiracy reduced competitive rivalry among non-defendant developers because the alleged suppression on the Dick land influenced them not to develop adjacent tracts. Thus, competition for steam rights and steam on those properties lessened. As discussed in its section of steam rights, *supra,* the Court finds no support for the plaintiff's "misinformation" theory. As there is no evidence that the alleged conspiracy discouraged any competitors from seeking new supplies in the Geysers, no lessening of rivalry in the steam market can be proved based upon such a theory.

leges four major aspects of performance that the defendants' suppression affected adversely: market output, prices for steam, economic efficiency and consumer welfare.

### 1. Effect on Output

■ The plaintiff alleges that one anti-competitive effect on the geothermal steam market resulting from the defendants' alleged conspiracy was a reduction in the overall supply of the Geysers' steam energy by 90 megawatts. To ease the difficulties of adjudicating this case, the parties and the Court agreed to this amount. To allow the plaintiff to capitalize on this "stipulation" as a measure of proof of anticompetitive effect would render futile the entire trial on the issue of such an effect.

Beyond the assumption that the defendants suppressed 90 megawatts of steam on the Dick property, the plaintiff has provided no evidence that "but for" the conspiracy more output would have been forthcoming from those wells. In fact, any alternative developer on the Dick property could have made the same decision not to exploit the steam at the level believed by the plaintiff to be optimum. Moreover, even if a new competitor had replaced the defendants as operators on the Dick property, there was no proof that it would necessarily succeed in finding and developing new steam.[20]

Therefore, the plaintiff bases its only proof of an anticompetitive effect on output entirely on a matter agreed to by the parties to make litigation of the issue of competitive effect more efficient. The Court rejects the plaintiff's attempt to bootstrap this conclusion based merely on a fact assumed for administrative convenience.

### 2. a. Effect on Price

The plaintiff's main contention is that the defendants' alleged conspiracy to suppress production affected the price of geothermal steam on the Dick property, the price paid to other PG & E suppliers and the price in the uncommitted market for steam. It was the evidence indicating a price increase in the market for geothermal steam during the period of alleged suppression that created the triable issue of fact sufficient to defeat the defendants' motion for summary judgment.

Before analyzing these purported effects, it is essential to detail how pricing of steam occurs in the Geysers geothermal steam market. Suppliers of geothermal steam contract with buyers pursuant to long-term requirements agreements. Under a "block" purchase contract, a seller agrees to provide a generating plant of a specified size (usually 55 or 110 megawatts) for a period of 30 years. Once the supply of steam is secured, the buyer builds· a generating unit at or near the geothermal source.

Such long-term contracts make the market price for geothermal steam much less responsive to changes in supply or demand than in an otherwise uncommitted market. An increase in the price that a utility will pay for steam, for example, impacts only those suppliers of steam not otherwise committed under long-term contracts. Suppliers providing steam already under a contractually set price will not be affected at all by price changes in the market for steam.

The long-term contracts for steam prevailing in the Geysers set price according to a formula based on several different factors. The PG & E formula (which all other geothermal steam buyers incorporated to some degree in their requirements contracts) derives steam price from several different factors, including the cost of al-

**20.** In fact, R.C. Dick's own testimony would indicate that the non-produced steam on the Dick property merely migrated to adjoining steam pools and was ultimately produced through the wells of other steam producers. If the plaintiff's theory is correct, the Geysers market as a whole suffered no loss of total steam output because any suppressed steam on the Dick property merely drained to adjacent well sites where some other geothermal producer exploited it.

ternative fuels and fossil fuel plant efficiencies. This formula is the same in every PG & E contract. It produces the same price paid to every PG & E vendor and is the only steam price term ever offered by PG & E.

The plaintiff argues that the defendants' suppression of 90 megawatts of output from the Dick property adversely affected the price for steam within the Geysers market. The plaintiff claims nine different price effects which, for simplicity, can be divided into three major sub-groups. These include: price effects on the Dick steam, price effects on other PG & E suppliers, and price effects on the uncommitted market for steam. As these price effects constitute a major portion of the plaintiff's contention that the defendants' conduct adversely restrained market performance, the Court will examine carefully each of these claims to ascertain whether the plaintiff has proved an anticompetitive effect by a preponderance of the evidence.

The plaintiff alleges a series of price effects concerning only the Dick property. The plaintiff claims that the suppression of steam reduced total steam revenues (the "asset" price) obtained from the property, resulted in lower Unit 15 plant efficiencies and reduced the flow price on steam from the Dick property because of contractual penalties incurred by the defendants.

■■■■ All of these alleged "effects" of suppression, however, are limited to the Dick property.[21] The plaintiff presented no evidence that a reduced asset price on the Dick property would in any way affect competition in the Geysers market as a whole. At most, these claimed "price" effects fell only upon the developers of this particular property and inferior rights holders. Such an impact is not a competitive effect. It is well established that an enterprise is free to set prices for its own product without fear of violating the antitrust

laws. See *JBL Enterprises*, 519 F.Supp. at 1088. This is so even if co-producers or royalty interests in that product are injured as a result. Harm to a single competitor is not sufficient to show the requisite antitrust harm to competition. *Cascade*, 710 F.2d at 1373. If the plaintiff believes that it has suffered harm from the defendants' actions in "misdeveloping" its land, it may sue to obtain contractual remedies for this injury, but it cannot seek antitrust remedies.

b. Price effects on other PG & E suppliers

■■■ The second major price effect that the plaintiff contends resulted from the defendants' alleged suppression is that the flow and asset prices on geothermal steam received by all other PG & E suppliers increased. The plaintiff bases this proposition on the assumption that PG & E replaced the suppressed Dick steam with fossil fuel. According to this scenario, as PG & E consumed more fossil fuel, its increased demand caused a price increase in the market for fossil fuel. As the price of fossil fuel rose, the fuel component in the PG & E price formula for geothermal steam reflected this increase. Other PG & E suppliers, therefore, obtained a higher flow price for that steam under long-term contract with PG & E. As higher flow prices increased revenues, so too did the asset prices of these steam resources increase.

The plaintiff, however, provided no evidence at trial to support this theory of price effect. The plaintiff offered only academic suppositions. There was no proof adduced as to whether PG & E actually replaced the suppressed steam or whether PG & E's replacement fuel, if any, had a marginal cost greater than the average cost of geothermal energy as reflected in the current contract price of steam. Instead, all that the plaintiff offered was a

---

**21.** The plaintiff has failed to prove that the defendants' conduct adversely affected plant efficiency at Unit 15 or reduced flow prices on the Dick steam. While there was proof that Unit 15 operated at a lower efficiency rate than some other units, there was no evidence introduced at trial that linked this lower efficiency to any assumed suppression. In fact, plaintiff's exhibit 717 shows that Unit 15 was eighth of the 16 PG & E units in terms of efficiency.

theoretical hypothesis of potential effects. As such, it is inadequate as proof of an *actual* effect of the defendants' conduct on geothermal steam competition in the Geysers market as required under Section 1. *Knutson*, 548 F.2d at 803.

### c. Price effects on the uncommitted steam market

The plaintiff's third set of alleged price effects resulting from the defendants' conspiracy centers on the market for steam not controlled by long-term contract, the "uncommitted" market. The uncommitted market, as that portion of the market without contractually fixed prices, would have been directly affected by a change in the supply of geothermal steam resulting from the defendants' alleged suppression. It is on this neo-classical market theory of supply and demand that the plaintiff relies most heavily.

The first market effect theory proposed by the plaintiff is that if additional steam had been available from the Dick land, and if it could have been sold in the uncommitted market, then prices would have decreased in that market. Because the defendants' allegedly suppressed steam, however, prices were higher than they would have been absent the conspiracy.

As supported by clear and convincing evidence, the Court finds that all the steam allegedly suppressed on the Dick property would, had it been produced, gone to PG & E under its 1977 contract agreement. The Court finds, based on its reading of the contract for Dick property steam, that PG & E would have purchased any and all steam produced by the defendants at the agreed contract price. Thus, the plaintiff's contention that the suppressed steam could have somehow entered the uncommitted market and lowered steam prices is wholly unsupported. The plaintiff, therefore, did not prove its first alleged effect on price.

The second market effect claimed by the plaintiff presumes that the suppressed steam was entirely committed to PG & E. The plaintiff contends that because Dick steam was not available, PG & E was forced to enter the uncommitted market to obtain additional supplies to meet its unsatisfied demand. According to the plaintiff's theory, this "spill-over" of demand into the uncommitted market drove prices higher than would have existed absent the defendants' suppression conspiracy.

The plaintiff, however, provided no factual support for its theoretical "spill-over" effect.[22] The Court adopts as a finding of fact testimony by PG & E's representative, Elmer Hall, that the company made no effort to replace the Dick steam in the uncommitted market. Actual evidence, therefore, contradicts the plaintiff's "spill-over" theory and its attendant hypothetical price effects. The plaintiff failed to prove any anticompetitive price effects under this "spill-over" argument.

Nor did the plaintiff prove by a preponderance of the evidence that the neo-classic model of supply and demand was an appropriate theory of market behavior in this uncommitted steam market. The Court accepts Dr. Sweeney's testimony as being a more credible witness and finds as fact that any price increases during the post-1977 years are explained most adequately by a theory of non-market pricing. As shown by Dr. Sweeney and accepted by this Court, the empirical price evidence supports a model of negotiated pricing by a small group of buyers with substantial market power. In such a market, supply had little or an indeterminate effect on the price of geothermal steam.

The fundamental assumption of a supply and demand model, that a large number of buyers and sellers are individually unable to affect price, is clearly not supported by the actual structure of the Geysers geothermal steam market. Instead, this is a highly concentrated market where steam prices range indeterminately along a con-

---

**22.** The only witnesses to testify to such an effect, plaintiff's experts, Professors Adelman and Gilbert, both conceded that such an effect was based solely on theory, not any established evidence.

tract curve. The steam's cost to the supplier and its value to the buyer sets the upper and lower limits of a negotiation frontier, but the terminal point along this set of possible prices is not determined by impersonal market forces. Rather, the price of geothermal steam is the result of bargaining between the parties.

In the Geysers geothermal steam market, the indeterminate nature of the resource price is mitigated by the existence of a reference point used by the parties in their negotiations. As shown by the empirical evidence and the testimony of GRI's Ronald Baldwin, the PG & E contract price provided a focus or floor price against which all other buyers juxtaposed their offers. No seller would take a price less than the PG & E price, as that company was always interested in contracting for steam at that price. Not unexpectedly, therefore, the price history of Geysers steam shows a clustering around the PG & E floor at the initial phase of new steam contracts.[23] For example, between 1972 and 1983, all Geysers geothermal steam contracts contained almost identical terms and, excluding one contract at 12 percent of the PG & E price, prices were within 2 percent of the PG & E price.

As described by the negotiated price theory, steam price is not a function of supply and demand, but instead a result of many factors. These include the relative power of each bargaining participant, the existence of a reference point from which to begin negotiation and the willingness of the parties to deviate from that point. As a change in supply would not adversely impact these factors, the plaintiff cannot prove even theoretically that the defendants' alleged suppression of steam had any effect upon the price of geothermal steam in the Geysers.

The final price effect claimed by the plaintiff relies on the "misinformation" theory and its effect on adjacent steam properties. Contending that the conspiracy diminished development of neighboring resources, the plaintiff argues that this "lost" steam would have entered the uncommitted market and lowered geothermal prices. As this Court has ruled that there is no proof of the plaintiff's operative assumption that the defendants' conduct in any way affected the willingness of suppliers in the Geysers market to develop adjacent steam properties, no further price effect based on such a theory can be proved.

## D. Efficiency and Consumer Welfare

The plaintiff's final allegation on the effects of suppression in the Geysers market contends that the defendants' suppression forced PG & E to purchase an additional $130 million of fossil fuel during this period. The plaintiff argues that this higher price fuel made the generation of electricity more inefficient and more costly to produce than it would have been absent suppression.

The Court cannot accept this contention as the plaintiff has provided no proof that PG & E replaced the "suppressed" Dick steam with higher priced fuels. In addition, injury of this type, even if proved, would have affected only the buyers market for steam and the ultimate consumers of geothermal electricity. The plaintiff, however, did not compete in this market. As such, it is without standing to complain of such injury. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983).

## E. Conclusion

Under no theory posited has the plaintiff proved an anticompetitive effect on the Geysers market resulting from the defendants' alleged conspiracy. Absent such proof, the plaintiff cannot prevail on its Section 1 claim as evaluated under the rule of reason. The Court, therefore, finds as a

---

**23.** As time passed, escalation clauses tended to diverge prices away from the PG & E focus price, but the initial pricing of long-term steam contracts can be most adequately explained by a non-market pricing mechanism.

matter of law no violation of Section 1 of the Sherman Act and accordingly enters judgment in favor of the defendants.

## V. SUMMARY JUDGMENT ON SECTION 2

 The final antitrust claim by the plaintiff alleges a violation of Section 2 of the Sherman Act for attempted monopolization and a conspiracy to monopolize the geothermal steam market in the Geysers. Three elements constitute prima facie evidence of an attempt to monopolize: (1) specific intent to control prices or destroy competition, (2) predatory or anticompetitive conduct directed to accomplishing this unlawful purpose, and (3) a dangerous probability of success. *Gough*, 584 F.2d at 390, *citing Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 853 (9th Cir.1977). Where, as here, the plaintiff cannot prove that the defendants had market power in the Geysers or that they engaged in anticompetitive conduct, no attempt to monopolize can be found. *Id.*

 The plaintiff also alleges a conspiracy to monopolize. Such an offense requires proof that the defendants had a specific intent to monopolize. *American Tobacco Company v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). As to this charge, the plaintiff's only proof of such requisite specific intent is the "stipulation" as to conspiracy entered into by the defendants solely to expedite the trial of anticompetitive effect. As discussed above, an agreement entered into in order to facilitate the Court's adjudication of the Section 1 claim cannot be converted into "proof" of the plaintiff's Section 2 allegations. As the plaintiff adduces no other proof of such intent, the Court finds that the claim of conspiracy to monopolize cannot be sustained.

The Court, therefore, enters judgment in favor of the defendants on the Section 2 claims of conspiracy to monopolize and attempted monopolization.

IT IS SO ORDERED.